**RECORD CLUB OF AMERICA, INC., Plaintiff,**

v.

**UNITED ARTISTS RECORDS, INC., Defendant.**

**No. 72 Civ. 5234 (WCC).**

United States District Court, S.D. New York.

Sept. 8, 1986.

As Amended Sept. 25, and Oct. 10, 1986.

---

**6.** If it had, that equation would have been equally arbitrary, thus itself running afoul of the

Eighth Amendment.

Nancy G. Grossman, McGuire & Tiernan, New York City, for plaintiff; Harold F. McGuire, of counsel.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendant; Janet P. Kane, Robert B. Weintraub, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

Plaintiff Record Club of America, Inc. ("RCOA"), a mail-order record and tape club, brought this action against United Artists Records, Inc. ("UAR"), a record company with which RCOA had entered into a licensing agreement. In its original complaint, RCOA alleged that UAR had anticipatorily repudiated and actually breached their licensing agreement. RCOA subsequently amended its complaint to add a claim that UAR had tortiously induced one of UAR's subsidiaries to breach a related agreement with RCOA, and a claim that UAR had violated the antitrust laws.

In late 1983, UAR moved for summary judgment on the tortious interference and antitrust claims. In an Opinion and Order dated June 17, 1985, I granted UAR's mo-

tion for summary judgment on the antitrust claim but denied its motion for summary judgment on the tortious interference claim. *Record Club of Am., Inc. v. United Artists Records, Inc.*, 611 F.Supp. 211, 217 (S.D.N.Y.1985).

The liability issues in the case were tried before the Court sitting without a jury in December 1985; trial of the damage issues was deferred. The parties agreed to submit posttrial memoranda, which were filed in due course. The Court has now carefully reviewed these memoranda, together with the testimony and the documentary evidence received at trial, and this Opinion and Order incorporates the Court's findings of fact and conclusions of law as required by rule 52(a), Fed.R.Civ.P. For the reasons set forth below, RCOA is entitled to judgment in its favor on its anticipatory repudiation and breach of contract claims. RCOA's tortious interference claim is dismissed.

*Background*

RCOA was founded by Sigmund Friedman in 1957 while he was a freshman at Brown University. Tr. at 3. Originally called "College Record Club," it became "Record Club of America" when it was incorporated in 1961. *Id.* Until it filed for bankruptcy in late 1974, RCOA was one of the largest mail-order record clubs. RCOA acquired new members through extensive national advertising and direct mail solicitation. Tr. at 4–5. RCOA also encouraged existing members to sign up new members. Tr. at 5. In return for payment of a one-time membership fee, a new member received a number of "free" or "bonus" records, and the right to purchase additional records at substantial discounts. Tr. at 3–7.

Approximately monthly until 1973, and periodically thereafter, RCOA distributed to its members a catalogue called the "Disk and Tape Guide" containing up-to-date listings of record albums, cassette tapes, and eight-track cartridges that were available for purchase. Tr. at 44–45. In its catalogs and advertising, RCOA promised existing and prospective members that it would process and ship their orders on the same day those orders were received. Tr. at 18–19. As a result, it was critical to RCOA that it receive advertised product promptly from its suppliers. Tr. at 17–18.

In the early 1970's, RCOA filed two actions against UAR[1] and other record companies alleging that they had violated the antitrust laws. Tr. at 174; *Record Club,* 611 F.Supp. at 213. In voluntary settlement of RCOA's claims against UAR, the parties entered into three separate but interrelated contracts, all of which took effect on October 1, 1970. *Id.* Initial negotiations for the contracts took place at UAR's headquarters in California; the parties then exchanged successive drafts until they settled upon the final wording of the contracts. Tr. at 16. All three agreements were to be governed by New York law. Px. 1 ¶ 18; Px. 2 ¶ 14; Px. 3 ¶ 14.[2]

The first contract was a license agreement pursuant to which UAR granted to RCOA a renewable nonexclusive license to advertise, manufacture, and distribute by mail-order UAR licensed recordings in the form of phonograph records, tape cassettes, and eight-track cartridges. Px. 1; Tr. at 13–16. The agreement provided for an initial term of three years and could be extended for two additional two-year option periods. Px. 1 ¶ 4(a), (b). RCOA was to notify UAR in writing 90 days prior to the expiration of the current term that it wished to extend the agreement for an additional two-year option period. *Id.* ¶ 4(b).

The license agreement permitted RCOA to sell UAR licensed product to its existing members and to give away UAR licensed product on a "free" or "bonus" basis to

**1.** At the time, UAR was called "Liberty/UA, Inc." Amended and Supplemental Complaint ¶ 2. It became "United Artists Records" on February 25, 1971. *Id.* UAR was merged into Capitol Records, Inc. on April 1, 1981. *In re*

*Record Club of Am., Inc.,* 28 B.R. 996, 997 (M.D. Pa.1983).

**2.** "Px." refers to plaintiff's trial exhibits, "Dx." to defendant's trial exhibits.

prospective members. Px. 1 ¶ 3. RCOA was required to pay a royalty on all licensed albums sold under the agreement and on "excess frees" given away under the agreement. *Id.* Excess frees are those units given away in excess of fifty percent of the total number of units distributed, whether sold or given away.[3] *In re Record Club of Am., Inc.*, 30 B.R. 418, 421 & n. 3 (M.D.Pa.1983). There was no limit on the number of UAR recordings that RCOA could distribute on a free or bonus basis. Px. 1; *see generally* Tr. at 58–61. The average total cost to RCOA of acquiring UAR licensed recordings under the license agreement was $1.20 for each album that was sold and $0.80 for each album that was given away on a free or bonus basis.[4] Tr. at 10–13, 74–75. The total cost of acquiring the same UAR product from regular wholesale distributors ranged from $2.90 to $5.33 per album. Tr. at 47, 165.

Pursuant to the license agreement, RCOA was required to maintain accurate records with respect to its distribution of UAR licensed product and to furnish UAR a royalty statement on a quarterly basis. Px. 1 ¶ 6. Royalties on recordings that RCOA sold were due on a quarterly basis. *Id.* Royalties on excess frees were not due until the end of each term.[5] *Id.* ¶ 3(b).

The agreement provided for guaranteed royalties of $150,000 for the initial three-year term, $120,000 for the first two-year option period, and $140,000 for the second two-year option period. Px. 1 ¶ 4(a), (b). The agreement also provided for quarterly minimum aggregate royalties. *Id.* The quarterly minimum aggregate royalties increased by $12,500 each calendar-year quarter of the initial three-year term, by $15,000 each calendar-year quarter of the first two-year option period, and by $17,500 each calendar-year quarter of the second two-year option period. *Id.* If, at the beginning of a calendar-year quarter, the aggregate amount of royalties paid during the current term of the agreement was less than the minimum aggregate guaranteed royalty for that quarter, RCOA was required to make an advance against the guaranteed royalty for the term sufficient to bring its aggregate royalty payments up to the minimum for the quarter. *Id.* ¶ 4(c), (d).

Under the license agreement, UAR was required to provide RCOA with samples of new releases. Px. 1 ¶ 7(a). This provision was important to RCOA because records generally have a short life cycle and new releases sell better than older recordings. Tr. at 32. RCOA needed these samples in order to decide what UAR product to in-

---

**3.** For example, if RCOA sold 1000 units and gave away 2000 units, then the total number of units distributed would be 3000 units. Fifty percent of the total number of units distributed would be 1500 units. Since RCOA gave away 2000 units, there would be 500 excess frees for which royalties would be due.

For those mathematically inclined, it can be shown that the number of excess frees is equal to $(F–S)/2$, where S represents the number of albums sold, and F represents the number of albums given away.

**4.** The difference in the cost of a "sold" album and a "free" one is primarily attributable to the difference in royalty payments. RCOA gave away approximately two and one-half times the number of albums it sold. *See In re Record Club of Am., Inc.*, No. BK 74–553, slip op. at 1–2 (Bankr.M.D.Pa. June 1, 1982), *aff'd*, 30 B.R. 418 (M.D.Pa.1983). Thus, RCOA was required to pay royalties on three-tenths of the albums it gave away. *See supra* note 3. Since the average royalty was $0.50 per album, this is equivalent to RCOA paying a royalty of $0.15 on *each*

album it gave away. This reduces the cost of a free album by $0.35 to $0.85. The remaining $0.05 is attributable to the fact that RCOA was required to contribute $0.06 to the American Federation of Musicians for each sold album but only $0.01 for each free album. *See generally* Tr. at 10–13.

**5.** As is discussed more fully in the Court's July 30, 1974 Opinion and Order, *Record Club of Am., Inc. v. United Artists Records, Inc.*, No. 72 Civ. 5234 (S.D.N.Y. Jul. 30, 1974), the difference in the time when royalty payments were due on sold recordings as opposed to excess free recordings is due to the method provided in the agreement for computing the number of excess frees for which royalties were due. The agreement provided that RCOA "shall have the right to distribute on a bonus or free basis without payment of royalty hereunder one-half of all Licensed Albums distributed hereunder *during the term hereof.*" Px. 1 ¶ 3(b).

clude in its national advertising and catalogues. Tr. at 32–33.

The other two agreements were requirements contracts between RCOA and All Disc Records, Inc. ("All Disc") and Liberty/UA Tape Duplicating, Inc. ("Liberty Tape"), two wholly-owned subsidiaries of UAR. Px. 2, 3; Tr. at 14. Under the All Disc contract, RCOA agreed, with two exceptions, to purchase from All Disc all UAR licensed recordings that RCOA wished to distribute in the form of phonograph records. Px. 2 ¶ 1; Tr. at 14. RCOA was entitled to have another record pressing company manufacture those selections that All Disc was unable to deliver within fourteen business days from receipt of RCOA's order. Px. 1 ¶ 2; Px. 2 ¶ 9(i). In addition, RCOA was entitled to manufacture UAR licensed records itself after the end of the first contract year if it opened its own record pressing plant. Px. 2 ¶ 9(ii). Under the Liberty Tape contract, RCOA agreed, with similar exceptions, to purchase from Liberty Tape all UAR licensed recordings that RCOA wished to distribute in the form of cassette tapes and eight-track cartridges. Px. 3 ¶¶ 1, 9; Tr. at 14.

The provisions permitting RCOA to have UAR licensed product manufactured elsewhere if All Disc or Liberty Tape did not fill its orders within fourteen days were the sine qua non of RCOA's entering into the requirements contracts. Tr. at 17. Unless it could count on prompt delivery, RCOA could not be reasonably certain that it would have advertised product in stock when it received orders from its members, and the quality of RCOA's fulfillment services would suffer.[6] Tr. at 17–20. In order for RCOA to do its own manufacturing pursuant to the various exceptions in the requirements contracts, UAR had to supply RCOA with so-called "master" sound recordings and other forms of intermediate product from which records could be pressed and tapes could be duplicated. Px. 1 ¶ 2; Tr. at 21.

RCOA was first entitled to make use of UAR licensed product on November 2, 1970. Px. 1 ¶ 1(f). RCOA included 103 UAR licensed recordings in the issue of its Disk and Tape Guide mailed to members between November 7, 1970 and November 18, 1970. Px. 72. This amounted to approximately one-quarter of the catalogue. Tr. at 21.

From the start, UAR's performance of its contractual obligations was less than satisfactory. At the height of the 1970 Christmas season, RCOA experienced significant delays in obtaining UAR product from All Disc. Tr. at 21. RCOA wrote a number of letters to UAR in an attempt to straighten out the delays. *E.g.*, Px. 5, 6; Tr. at 21–23. RCOA explained that it could not wait more than 14 days for the albums it ordered, and notified UAR that it could not continue to advertise UAR product as it had been doing if it could not count on having UAR records in stock when it received orders from its members. Px. 5, 6. Sigmund Friedman ("Friedman"), RCOA's president, made requests in writing and by telephone for production materials so that RCOA could manufacture the selections All Disc had failed to ship within fourteen days. Px. 6; Tr. at 20–23. Michael Lipton ("Lipton"), a UAR vice-president, told Friedman that UAR was experiencing production problems, and that UAR would do everything possible to expedite RCOA's orders. Tr. at 23. However, Lipton indicated that UAR wanted to do the record pressing itself, and did not want to provide RCOA with the master tapes necessary for RCOA to press the overdue records elsewhere. *Id.* On December 14, 1970, Mark Levinson ("Levinson"), UAR's general counsel, wrote Friedman to confirm the

---

6. "Fulfillment" in the record club business [includes] the ... shipping of records to members.... Fulfillment is extremely important to the operation of a record club. If the fulfillment is poor, many members cancel and those who cancel for service reasons rarely rejoin.

*In re Columbia Broadcasting System, Inc.,* 72 F.T.C. 27, 70 (1967), *aff'd in part and rev'd in part,* 414 F.2d 974 (7th Cir.1969), *cert. denied,* 397 U.S. 907, 90 S.Ct. 903, 25 L.Ed.2d 88 (1970).

substance of the telephone conversation with Lipton. Px. 7.

The following year, RCOA again experienced severe delays in obtaining UAR product from All Disc. RCOA employees made numerous requests for production materials for those selections All Disc had failed to ship within fourteen days. Tr. at 24. On October 2, 1971, Friedman wrote to Michael Stewart ("Stewart"), UAR's president, to complain about the service RCOA was receiving. Px. 9. Friedman noted that UAR's service had "disintegrated to the point where it [could] only be classified as appalling," and that UAR had been in "serious breach of [the license] agreement on a large number of occasions." *Id.* Friedman also requested production materials so that RCOA could have the delayed product manufactured elsewhere. *Id.* Friedman followed up his letter with a telephone call to Lipton. Tr. at 26–28. Friedman reminded Lipton that Lipton had promised that RCOA's orders would be expedited, but that RCOA was experiencing the same problems that it had had the previous year. *Id.* When Friedman complained that RCOA was getting the "run around" with regard to obtaining production materials, Lipton exclaimed that RCOA would never get master tapes to press records. Tr. at 28. Friedman notified Lipton that the next time RCOA had a major problem getting timely deliveries of UAR product, RCOA would stop advertising UAR product. Tr. at 31.

On October 11, 1971, Levinson again wrote to Friedman. Px. 10A. Levinson noted that Stewart had given Levinson a copy of Friedman's October 2 letter and thanked Friedman for bringing to UAR's attention the problems that RCOA was experiencing. *Id.* Levinson promised that UAR would rectify them. *Id.* However, in a second letter dated the same day, Levinson notified Friedman that UAR had retained Benjamin Spector ("Spector"), a certified public accountant, to conduct an audit of RCOA's books and records pursuant to paragraph 6 of the license agreement. Px. 10B; Tr. at 31–32.

Sometime in late October or early November 1971, Spector and an associate conducted an audit of RCOA's books and records for the period ending June 30, 1971, the end of RCOA's 1971 fiscal year. Tr. at 321; Dx. 62. On January 17, 1972, Spector forwarded his report to UAR. Dx. 62. UAR did not make the report available to RCOA for some six months. Tr. at 38–39; Deposition of George Port at 14–18 [hereinafter cited as "Port Dep."].

Peat, Marwick, Mitchell & Co. ("PMM") was RCOA's regular auditor. Tr. at 372. PMM had viewed RCOA's inventory as of June 30, 1971, and reviewed RCOA's books and records with respect to purchases and sales. PMM had certified RCOA's financial statements with a "clean opinion" for the fiscal year ending June 30, 1970. Tr. at 340–43, 370–83.

In February 1972, RCOA opened its own tape duplicating facility. Tr. at 95. Accordingly, RCOA was no longer required to buy from Liberty Tape those UAR licensed recordings that RCOA wished to distribute in the form of cassette tapes or eight-track cartridges. Px. 3 ¶ 9(ii). RCOA was entitled to order interim master tapes from UAR and to manufacture UAR cassette tapes and eight-track cartridges itself. *Id.;* Px. 1 ¶ 2; Tr. at 95.

Throughout the latter part of 1971 and the early part of 1972, UAR was not providing RCOA with samples of new releases as required by paragraph 7(a) of the license agreement. Tr. at 32–33. As a result, RCOA frequently had to purchase samples of new UAR releases in retail stores. Tr. at 33. In February 1972, RCOA wrote to UAR to complain that it was not receiving the samples. Tr. at 32. Some three months later, UAR responded to RCOA's complaint by promising to place RCOA on a disc jockey distribution list. Tr. at 35.

On May 18, 1972, Levinson wrote to Friedman claiming that RCOA was in breach of the license agreement. Px. 21 at 1. Levinson noted that RCOA did not maintain its books and records in an accurate manner and that as a result it was impossible to verify the accuracy of the

royalty reports RCOA had submitted to UAR. In particular, Levinson complained that RCOA did not maintain a so-called "perpetual" inventory system or any records of the distribution of free records. Levinson also observed that its auditor had discovered instances of "negative inventory figures" (i.e., increases in inventory without purchases), which Levinson considered an impossibility since RCOA's "stated policy [was] to accept no returns from [its] customers." Levinson charged that RCOA had not paid royalties on excess frees on a quarterly basis as it was required to under the license agreement and that as a result RCOA owed some $65,000 in royalties on excess frees for the period ending June 30, 1971. *Id.* at 2. Levinson also complained that RCOA was distributing too many UAR recordings on a free or bonus basis. Levinson asserted that the license agreement provided a fifty percent limit on RCOA's distribution of free records, and that RCOA was in fact distributing approximately seventy-three percent of UAR's product on a free basis. Levinson accused RCOA of using UAR product "as a loss leader to promote the product of competing companies." Levinson gave RCOA seven days to "rectify [its] errors and bring [its] accountings to [UAR] up to date." *Id.* at 3. Levinson concluded that unless UAR received proper accountings and payment within seven days, it would have no alternative but to proceed with all remedies available to it.

Friedman wrote back to Levinson and requested that he contact George Port ("Port"), RCOA's general counsel. Tr. at 39–40. Port and Levinson had a number of conversations, and on June 6, 1972, Port met with Levinson and Stewart at UAR's headquarters in California. *Id.* During that meeting, Stewart told Port that he "didn't like the deal [between RCOA and UAR], that someone else had made the deal, [that] he didn't think it was a good deal for [UAR], and [that] he wished to renegotiate the deal." Port Dep. at 19; Px. 24 at 2. Port responded that RCOA felt it had a firm contract with UAR and that RCOA had lived up to the terms of that contract. Port Dep. at 20. However, Port indicated that RCOA would consider renegotiating the terms of the agreement within "reasonable parameters" to keep Stewart happy. *Id.* Stewart told Port that "as far as he was concerned, the agreement was over based on [RCOA's] substantial breaches of the agreement based on non-payment of royalties, on excess frees." *Id.* Port disagreed. It was his position that under the license agreement, royalties on excess frees were not due until the end of the contract term. *Id.*

After Port returned to the East coast, he received a follow-up letter dated June 8, 1972 which Levinson wrote to reconfirm what Levinson had told Port during their meeting. Px. 22. Levinson reiterated that it was UAR's "opinion that the agreement between [it and RCOA] has terminated by virtue of the various breaches committed by [RCOA]." As an indication of UAR's "good faith," Levinson indicated that UAR would continue to supply RCOA with licensed product during the pendency of the parties' negotiations for a new agreement. Levinson concluded that if RCOA and UAR were unable to agree on a new contract, UAR "will, of course, cease supplying [RCOA] with product."

On June 15, 1972, Port wrote to Levinson with proposals for a new agreement. Px. 24. On July 27, 1972, Levinson responded to Port's June 15 letter. Px. 27. Levinson began by observing that at the June 6 meeting, Stewart had "stated that it was [UAR's] view that [RCOA] was in material breach of its agreement and [that] as a result of this material breach, the agreement had terminated." According to Levinson, "[t]his constituted notice to [RCOA] as to the in fact termination of the agreement." Levinson stated that the proposals in Port's June 15 letter were much the same as the proposals he had made during the June 6 meeting, which had been rejected "out of hand." Levinson reminded Port that Levinson had told Port to come back with RCOA's "best offer." Levinson concluded,

> [I]f your letter contains the best offer you can make, then I must assume that

Record Club of America does not wish a new agreement with United Artists Record [sic], Inc. Accordingly, we will stop the continued servicing of new product to your company, which I had done as an accommodation pending resolution of our negotiations. If my assumtion is incorrect, let me know as soon as possible.

Px. 27 at 2.

On August 1, 1972, Port responded to Levinson's letter. Px. 28. Port reiterated that RCOA believed it was in compliance with the terms of the license agreement. He noted that it was obvious that RCOA and UAR differed on the proper interpretation of the agreement, and once again expressed RCOA's willingness to renegotiate the agreement in order to resolve the dispute.

The following day, RCOA removed 51 of 54 UAR recordings from the Disk and Tape Guide issue that was currently in preparation. Px. 29; Tr. at 43–46. RCOA left three items in that issue of the Disk and Tape Guide because it had sufficient excess inventory on those items to fill the orders which RCOA had learned from experience it could expect in response to an item's being included in an issue of the Disk and Tape Guide.[7] Tr. at 46–47. At the same time RCOA pulled all UAR product from its national advertising. Tr. at 44. RCOA removed two of the remaining three UAR items from the next Disk and Tape Guide. Px. 72 at 3. Thereafter, RCOA did not resume advertising UAR recordings in its Disk and Tape Guide until the Spring of 1973. Px. 72. Even then, RCOA did not advertise UAR product before it had accumulated enough inventory to fill expected orders. Tr. at 86–88. RCOA never again included UAR licensed recordings in its na-tional magazine advertising. Tr. at 44, 78–79, 86.

On August 28, 1972, Levinson responded to Port's August 1 letter. Px. 31. Levinson observed that it was obvious that RCOA and UAR were "not on the same wave length." He reiterated,

[D]ue to Record Club's various material breaches of the agreement entered into between our two companies (all of which have been previously communicated to you), the term of that agreement has terminated. The term for curing any of these breaches has long since passed, and it is only the desire to come to a new agreement that stops the matter from being forwarded to our litigation attorneys.

. . . .

[I]f a new contract is not executed within thirty days of your receipt of this letter, and the outstanding audit settled, we shall have no alternative but to stop the continued servicing of new product and commence an immediate action against the Record Club of America.

*Id.* at 1–2.

Before RCOA stopped advertising UAR product in early August 1972, it had been ordering approximately 60,000 UAR licensed albums a month from All Disc. Px. 83. Between October 1, 1972, the date on which Levinson had promised that UAR would stop servicing RCOA with new product, and December 31, 1972, RCOA ordered 12,300 UAR licensed recordings from All Disc in an attempt to fill orders received from members in response to advertisements placed prior to August 1972. Dx. 73 at 2; Tr. at 245. RCOA eventually received all but approximately 1,000 of these albums, but only after substantial delays.[8]

---

**7.** RCOA encoded its order forms in such a way that when RCOA received an order it could determine the national advertisement or Disk and Tape Guide issue to which the purchaser had responded. Tr. at 117. RCOA kept statistics on the response patterns to its advertising. *See, e.g.,* Px. 92, 93. From these statistics, RCOA was able to determine when it could expect to receive its first orders in response to an advertised item. *See generally* Tr. at 115–18.

**8.** RCOA had been experiencing delays and failures to ship UAR product for some time. For example, from July 28, 1972 to December 31, 1972, RCOA placed 128 orders for UAR licensed albums with All Disc. Px. 83, 85; Dx. 73. Eighteen orders were never filled at all. Px. 85, 86. Only 11 orders were shipped within the 14–day period provided in the license agreement. Of the 99 remaining orders, 35 were shipped within 30 days, 28 took between 30 and 60 days, 14

Dx. 72 at 3–4; Dx. 73 at 2; Tr. at 76–77, 241–45. RCOA was forced to buy some of the albums that were not shipped or were delayed from a wholesale distributor at prices many times greater than the records would have cost under the license agreement. Tr. at 76–77, 242, 245, 264–65.

In early December 1972, RCOA commenced this action against UAR alleging that UAR had actually and anticipatorily breached the license agreement. Complaint ¶ 24. RCOA sought, *inter alia*, a declaration that the agreement "remain[ed] in full force and effect," and preliminary and permanent injunctive relief requiring UAR to supply it with the production materials necessary for it to manufacture UAR licensed product. At about the same time UAR filed a declaratory judgment action against RCOA in the District Court for the Southern District of California. Tr. at 79. The California action was subsequently transferred to the Southern District of New York and consolidated with this action.

As noted above, despite UAR's position that the license agreement had terminated, All Disc filled most of the limited number of orders for older records that RCOA placed between October 1972 to December 1972, albeit after substantial delays. RCOA therefore decided to see if UAR would fill orders for newer recordings, and in January 1973, RCOA placed a number of so-called "test orders" for recently released UAR recordings in the form of albums, cassette tapes, and eight-track cartridges. Tr. at 80–81; Px. 37. RCOA also ordered interim master tapes for these recordings so that it could manufacture additional cassette tapes and eight-track cartridges itself. Tr. at 80–81, 95–96. All Disc shipped about 40 percent of the test orders within two weeks. Tr. at 82. The balance of the test orders were filled by early March. *Id.*

Because All Disc had filled some of the test orders promptly, RCOA decided to see if it could get assurances from UAR that future orders would be honored and filled promptly. Tr. at 83. Between February 1973 and May 1973, RCOA made several requests, both orally and in writing, for assurances that UAR would continue to supply RCOA with UAR licensed recordings during the pendency of the litigation. Tr. at 292–305; Px. 41. RCOA made these requests so that it could resume advertising UAR product without first having to accumulate sufficient inventory to satisfy resulting orders. Tr. at 292–305. UAR did not respond to RCOA's request for assurances for some months. Tr. at 298–305. In May 1973, Simon Rose, who at the time was representing UAR in this action, informed RCOA's counsel that UAR had "just flat out declined to consider giving the type of assurances to [RCOA] that would enable [RCOA] to know that it could have product on a timely basis and hence advertise it." Tr. at 302–03.

Beginning late May 1973, RCOA attempted to place orders for interim master tapes with which to duplicate cassette tapes and eight-track cartridges. Tr. at 94–96, 198–203. Because RCOA had opened its own tape duplication facility in February 1972, it no longer had to order finished cassettes and cartridges under its requirements contract with Liberty Tape, but was entitled to order production materials to do its own tape duplication. Px. 3 ¶ 9(ii). UAR never filled any of these orders for interim master tapes. Tr. at 94–96, 198–203.

Meanwhile, as a result of the test orders and purchases during the previous year, RCOA had accumulated sizeable inventories of several UAR items, and cautiously began advertising two of these items in its Disk and Tape Guide, but not in its national magazine advertising. Tr. at 86. RCOA gradually increased the number of UAR items included in the Disk and Tape Guide through the end of 1973, but only after accumulating sufficient inventory to fill expected orders. Tr. at 86–87; Px. 72.

took between 60 and 90 days, and 22 took more than 90 days. Px. 85. RCOA had to purchase many of these items from a wholesale distributor at substantially increased costs. Tr. at 76–77, 242, 245, 264–65.

As noted above, the license agreement gave RCOA the option of extending the agreement for an additional two years from October 1, 1973 to September 30, 1975. Px. 1 ¶ 4(b); Tr. at 88–89. The option was to be exercised at least ninety days in advance of the expiration of the initial three-year term, i.e., on or before July 2, 1973. Px. 1 ¶ 4(b); Tr. at 88–89. Because UAR insisted that the license agreement had terminated and RCOA was suing UAR for a declaration that the agreement was still in full force and effect, Port felt it would be futile to exercise the option. Port Dep. at 41. Accordingly, he did not exercise the option at the specified time. *Id.* Port later had second thoughts about the ramifications of not trying to exercise the option, so he attempted to do so, both orally and in writing, in August and September 1973. *Id.* at 42–44; Tr. at 89–90; Px. 44. UAR refused to honor the attempted exercise of the option. Port Dep. at 42–44; Px. 46; Tr. at 90. At the same time, UAR instructed All Disc to place all RCOA orders "on hold." Px. 44. Neither UAR nor All Disc notified RCOA of this action for almost a month. Px. 47. On October 3, 1973, UAR notified All Disc and Liberty Tape that the license agreement had expired on September 30, 1973, and that they should cease accepting or processing RCOA orders. Px. 48. Because UAR had refused to honor RCOA's exercise of the option to extend the license agreement, and insisted that the agreement would terminate on September 30, 1973 at the end of the initial three-year term, RCOA considered it futile to tender the minimum guaranteed royalty for the first calendar-year quarter of the first option period, and it did not do so. Tr. at 261–62.

Both UAR and RCOA moved for summary judgment in the pending action. In an Opinion and Order dated July 30, 1974, the Court held that royalties on "excess free" distribution were not due on a quarterly basis as UAR had claimed. *Record Club of Am., Inc. v. United Artists Records, Inc.,* No. 72 Civ. 5234 (WCC), slip op. at 17–19. The Court also held that RCOA's late exercise of the option was effective to extend the license agreement. *Id.,* slip op. at 16–17, 22.

Following the Court's decision, RCOA attempted to order interim master tapes and other production materials for three UAR licensed items. Px. 63. Despite the Court's decision that the agreement had been extended for an additional two years, UAR rejected RCOA's orders, claiming that "continuing litigation" prevented the filling of RCOA's orders. Px. 63; Tr. at 99. Immediately thereafter, RCOA reordered the same items, ordered new items, and reminded UAR that this Court had held that the agreement had been extended for an additional two years. Tr. at 99. UAR did not fill any of these orders. Tr. at 161.

On December 23, 1974, RCOA filed a petition in the Bankruptcy Court for the Middle District of Pennsylvania for an arrangement under chapter 11 of the Bankruptcy Act. *Record Club,* 611 F.Supp. at 213. At the request of a court-appointed receiver, this action was transferred to the Court's suspense docket, where it remained until 1982, when RCOA emerged from bankruptcy and requested that the matter be restored to the active calendar. *Id.* During the remainder of the first option period, which ended September 30, 1975, UAR repeatedly took the position that the license agreement had terminated. Tr. at 161.

On March 24, 1983, RCOA filed an amended and supplemental complaint in which, as noted above, it added a claim that UAR had tortiously induced All Disc to breach its requirements contract with RCOA, and a claim that UAR had violated the antitrust laws. In late 1983, UAR moved for summary judgment on the tortious interference and antitrust claims. In an Opinion and Order dated June 17, 1985, I granted UAR's motion for summary judgment on the antitrust claim but denied its motion for summary judgment on the tortious interference claim. *Record Club,* 611 F.Supp. at 217. Thus, three claims remained for trial: (1) that UAR had anticipatorily repudiated the license agreement, (2)

that UAR had actually breached the license agreement, and (3) that UAR had tortiously induced All Disc to breach its requirements contract with RCOA.

*Discussion*

■ The agreements between UAR and RCOA are essentially contracts for the sale of goods, and are therefore governed by the New York Uniform Commercial Code ("UCC"). Section 2–610 of the UCC provides, in relevant part,

> When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may
>
> (a) for a commercially reasonable time await performance by the repudiating party; or
>
> (b) resort to any remedy for breach (Section 2–703 or Section 2–711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and
>
> (c) in either case suspend his own performance or proceed in accordance with the provisions of [Article 2 of the UCC] on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 2–704).

N.Y.U.C.C. § 2–610 (McKinney 1964). "To constitute an anticipatory repudiation there must be a clear manifestation of intent communicated in advance of the time for performance that when the time for performance arrives the required performance will not be rendered." R. Anderson, Uniform Commercial Code § 2–610:11, at 230 (3d ed. 1983); *see also Tenavision, Inc. v. Neuman*, 45 N.Y.2d 145, 150, 379 N.E.2d 1166, 1168, 408 N.Y.S.2d 36, 38 (1978). The expression of intention not to perform must be positive and unequivocal. *Id.*; J. White & R. Summers, *Handbook of the Law under the Uniform Commercial Code* § 6–2, at 213 (2d ed. 1980). In addition, "a demand for greater performance than agreed upon constitutes an anticipatory repudiation 'when under a fair reading it amounts to a statement of intention not to perform except on conditions which go beyond the contract.'" *Id.* at 212 (quoting UCC § 2–610 comment 2); *REA Express, Inc. v. Interway Corp.*, 538 F.2d 953, 955 (2d Cir. 1976).

■ Applying these principles to the facts of this case, I conclude that UAR anticipatorily repudiated its agreement with RCOA on at least four separate occasions, beginning with the June 6, 1972 meeting. At that meeting, Stewart told Port that the agreement "was over," Port Dep. at 20, and that UAR "had no contract" with RCOA, Deposition of Michael Stewart at 37. Subsequently, in letters dated July 8, 1972, July 27, 1972, and August 28, 1972, UAR reiterated that it was of the opinion that the agreement had terminated. Px. 22, 27, 31. It is difficult to conceive of a more positive and unequivocal statement of intention not to perform. Moreover, although UAR continued to supply RCOA with new product after June 6, 1972, UAR indicated that it was doing so only as an accommodation during the pendency of negotiations for a new contract on terms substantially more favorable to UAR than those of the existing agreement. UAR repeatedly told RCOA that this accommodation would cease if a new contract was not signed. Px. 31. Even if UAR's statements that the agreement had terminated did not constitute an anticipatory repudiation, surely its statements that it would cease servicing RCOA unless RCOA entered into a new agreement containing terms substantially more favorable to UAR was such a repudiation.

UAR nonetheless advances a number of theories to justify its repudiation. UAR contends that it was entitled to repudiate the agreement because RCOA had already breached the agreement by (1) failing to keep accurate books and records, (2) failing to pay royalties for so-called "excess frees" on a quarterly basis, and (3) failing to pay copyright fees owed to the Harry Fox Agency ("Fox") for albums distributed on a free or bonus basis. I conclude that none

of these alleged breaches entitled UAR to repudiate the agreement.

First, I find as a matter of fact that RCOA's books and records were kept accurately. PMM, RCOA's outside auditor, participated in the taking of a physical inventory at the end of RCOA's 1970, 1971, and 1972 fiscal years. In each of those years, PMM examined RCOA's books and records and certified RCOA's financial statements with clean opinions. As UAR's auditor admitted on cross-examination, in order to certify a company's financial statements with clean opinions, an accountant proceeding in accordance with generally accepted accounting principles would have to satisfy itself that the company's records were kept properly. Tr. at 341.

■ The only evidence that UAR offered of any irregularities in RCOA's record keeping was the testimony and the February 1972 report of UAR's auditor, Spector. Spector identified a number of alleged deficiencies in RCOA's record keeping. His complaints focused mainly on RCOA's inventory accounting and its order processing. Although Spector faulted RCOA for failing to use a perpetual inventory system, he admitted on cross-examination that generally accepted accounting principles do not require the use of such a system; many other methods are acceptable. Tr. at 349. Spector noted that during the course of his audit, he found instances of negative inventory figures, which he thought odd since RCOA did not accept returns from its members. However, RCOA did accept returns of defective merchandise and misshipments, each of which could result in negative inventory figures if current shipments of the item were small. *See, e.g.,* Tr. at 376–77.

In general, I am not surprised that Spector experienced difficulties in verifying RCOA's inventory. RCOA maintained a physical inventory system. At the end of each calendar-year quarter, RCOA stopped the processing of orders for one to two days while its accounting staff, internal audit staff, and quality control staff took a count of the inventory on hand. At the end

of each fiscal year, PMM, RCOA's outside auditor, brought in a team of certified public accountants from PMM's staff to verify the physical inventory. Friedman testified that due to the size of RCOA's warehouses and the millions of albums on hand, it took about 350 people to complete the fiscal year-end inventory. Spector undertook to audit RCOA with the aid of a single associate. In addition, he conducted his audit in the middle of a calendar-year quarter, while order processing continued.

■ With regard to RCOA's order processing, Spector faulted RCOA for destroying the original order forms 45 days after they were received. Spector claimed that because of this practice he (and therefore UAR) was required to rely on RCOA's figures. Friedman testified at length concerning the method by which RCOA processed and recorded members' orders. As they were received, orders were routed to the warehouse for fulfillment, since RCOA prided itself on speedy processing and shipment. From there, the orders went to RCOA's computer department which transferred the information from the orders into RCOA's computers. Finally, the orders went to a retaining area where they sat for 45 days. At the end of this 45-day period the original orders were discarded. There was nothing unusual or improper about the process. Many companies employ such a system. RCOA had some 5 million members, and at any one time there were tens of thousands of orders passing through its warehouses. RCOA could not possibly have kept all the original order forms it received, and it was not unreasonable for RCOA to destroy those orders after 45 days. The original orders were kept long enough for an auditor to verify the accuracy of the process by comparing computer records of the orders with the actual orders. This is in accordance with generally accepted accounting principles and is apparently one of the methods PMM used to verify RCOA's books and records.

On the whole, I find that Spector's audit was not conducted in a manner consistent with achieving meaningful and accurate re-

sults. It is difficult to believe that UAR honestly thought that Spector and his one associate could properly conduct an audit of an operation the size of RCOA. In sum, I conclude that RCOA accurately maintained its books and records in the period preceding UAR's repudiation of the license agreement.

Second, UAR claims that RCOA was in breach of the agreement by failing to make quarterly royalty payments with respect to RCOA's excess distribution of free or bonus albums. As noted above, RCOA was required to pay royalties on those albums it distributed free only to the extent that the number of those albums exceeded one-half of all albums RCOA distributed. In ruling on the parties' cross-motions for summary judgment in 1974, I held that royalties for the so-called "excess frees" were not due until the end of the initial term of the agreement. *Record Club of Am., Inc. v. United Artists Records, Inc.*, No. 72 Civ. 5234 (WCC), slip op. at 17–19 (S.D.N.Y. Jul. 30, 1974). Thus, RCOA was also not in breach for failing to make quarterly royalty payments with respect to its excess distribution of free or bonus albums.

The third alleged breach that UAR claims entitled it to repudiate the license agreement was RCOA's failure to pay copyright fees to Fox. Pursuant to paragraph 3(c) of the license agreement, RCOA warranted that it would "pay, promptly and directly, ... all license fees with respect to music copyrights, due and payable as a result of [RCOA's] distribution of" licensed albums under the agreement. Px. 1 ¶ 3(c). Most of these copyright fees were payable to Fox, which represented the vast majority of copyright proprietors. Tr. at 131. By this provision, RCOA was in essence protecting UAR from a claim by Fox

if in fact RCOA failed to pay its copyright fees.

■ UAR's reliance on this provision is insufficient to justify its attempt to excuse its repudiation. RCOA, it must be acknowledged, did violate paragraph 3(c) by failing to pay copyright fees on those records it gave away,[9] but this fact only became known to UAR some two to three years after its repudiation, well after this litigation was commenced. At the time UAR repudiated the agreement UAR did not know that RCOA was not paying copyright fees for the albums RCOA gave away. Although it would appear that RCOA provided UAR's auditor with RCOA's quarterly copyright fee reports showing RCOA's payments to copyright owners and/or their agents with respect to RCOA's distribution of UAR licensed recordings, tr. at 266–67, 382, the auditor's report made no mention of any deficiencies in the payment of copyright fees, Dx. 62. There was also no mention of RCOA's failure to pay copyright fees in UAR's May 18, 1972 written notice of breach and opportunity to cure. Px. 21. Even Fox apparently did not learn of RCOA's failure to pay copyright fees on frees until an audit was conducted sometime in late 1973. Tr. at 132–35. Finally, UAR's counsel contended at trial that UAR did not learn of RCOA's failure to pay Fox until RCOA filed for bankruptcy. Tr. at 266. It is apparent that UAR's reliance on RCOA's failure to pay Fox is simply a belatedly conceived attempt to justify its repudiation. Since at the time it repudiated the license agreement, UAR did not know that RCOA was not paying Fox on those albums RCOA distributed on a free or bonus basis, that fact cannot excuse UAR's repudiation.

9. RCOA paid copyright fees to Fox on those records RCOA sold. Tr. at 133. However, RCOA did not believe it owed copyright fees on albums that were distributed on a free or bonus basis, and initially did not make such payments. Tr. at 132. Eventually, Fox conducted an audit, and took the position that RCOA was required to pay copyright fees on the albums it gave away as well as the albums it sold. *Id.* Accord-ingly, beginning in late 1973, RCOA began making deposits on account with Fox pending the resolution of the dispute. Tr. at 132–35. After RCOA filed for bankruptcy, the issue was submitted to the bankruptcy court, and that court ultimately determined that copyright fees were due on the albums RCOA distributed free. Tr. at 132.

Moreover, whether or not UAR knew that RCOA was not paying Fox, it cannot now rely on paragraph 3(c) to excuse its repudiation because it failed to give RCOA notice of this deficiency and an opportunity to cure it. Pursuant to paragraph 15(a) of the license agreement, RCOA was entitled to notice of and an opportunity to cure any alleged breach of the agreement before UAR could cancel or terminate the agreement. Px. 1 ¶ 15(a). UAR never sent RCOA any notice of default alleging that RCOA was not complying with paragraph 3(c) of the agreement. Tr. at 259–61. Indeed, the May 18, 1972 letter from Levinson to Friedman was the only notice of breach that UAR ever sent RCOA. That letter dealt only with the accuracy of RCOA's books and records and the quarterly payment of royalties on excess frees. Thus, UAR never gave RCOA notice that UAR considered the failure to pay Fox a breach of the agreement and did not provide RCOA the requisite 60 days to cure the error. Accordingly, UAR had no right to cancel or terminate the agreement.

UAR next contends that even if RCOA was not actually in breach of the agreement, UAR was entitled to repudiate the agreement because UAR held a good faith belief that RCOA had breached the agreement. This is not a sufficient justification for UAR's actions. First of all, I have serious doubts whether UAR acted in good faith in repudiating the agreement. In the same breath in which it accused RCOA of having breached the license agreement by failing to maintain accurate books and records, UAR sought to enter into a new agreement with RCOA on terms substantially more favorable to UAR. Had UAR honestly believed that RCOA's books and records were so inaccurate as to justify terminating the agreement, UAR would not likely have considered entering into a new agreement. Based on Stewart's comments that UAR's new management did not think the license agreement was a good deal for UAR and wished to renegotiate it, Port was probably not too far off the mark when he concluded in his June 15, 1972 letter that UAR was using "a purported breach [by RCOA] as a lever to renegotiate" the agreement.

However, even assuming that UAR was acting in good faith, that would not excuse its repudiation. The test for an anticipatory repudiation is an objective one and good faith is immaterial. J. Calamari & J. Perillo, *The Law of Contracts* § 12–6, at 461 (2d ed. 1977) (citing 4 A. Corbin, *Corbin on Contracts* § 973 (1951)); *see, e.g., United Cal. Bank v. Prudential Ins. Co.*, 140 Ariz. 238, 278–79, 681 P.2d 390, 430–31 (Ct. App.1983). An anticipatory repudiation may be based upon an erroneous contract interpretation just as it may be based upon a refusal to perform for any other reason. Whatever the breaching party's state of mind, the impact on the innocent party is the same—he faces total loss of the repudiator's performance, to which the contract entitled him. This principle is in accord with the Restatement of Contracts which provides that "a party acts at his peril if, insisting on what he mistakenly believes to be his rights, he refuses to perform his duty." *Restatement (Second) of Contracts* § 250 comment d, at 274–75 (1981).

UAR next contends that even if it was not privileged to repudiate the agreement, it subsequently retracted its repudiation. Section 2–611 of the UCC provides, in relevant part:

(1) Until the repudiating party's next performance is due he can retract his repudiation unless the aggrieved party has since the repudiation cancelled or materially changed his position or otherwise indicated that he considers the repudiation final.

(2) Retraction may be by any method which clearly indicates to the aggrieved party that the repudiating party intends to perform, but must include any assurance justifiably demanded under [section 2–609].

N.Y.U.C.C. § 2–611 (McKinney 1964). UAR never indicated to RCOA, either by words or by conduct, that UAR intended to perform. UAR does not and could not

940

argue that it expressly communicated to RCOA that it wished to retract its repudiation. However, UAR notes that a repudiating promisor may also retract his repudiation by conduct inconsistent with his repudiation. UAR asserts that by filling RCOA's orders after the repudiation, UAR retracted its repudiation. I do not agree. UAR never rendered to RCOA the performance RCOA was entitled to under the contract, nor did it give RCOA any reason to believe RCOA might receive that performance. Although the agreement did not contain a provision requiring UAR to supply product within fourteen days, it did contain a provision that if UAR did not supply product within fourteen days RCOA was entitled to obtain the production materials necessary to manufacture the delayed material elsewhere. This was the sine qua non of RCOA's entering into the agreement. It was the essence of the performance for which RCOA had contracted. It is true that UAR filled some orders after its repudiation. However, UAR never filled several orders, and those orders that UAR did fill were filled after such significant delays that UAR's performance was of little value to RCOA. Most significantly, UAR never retreated from its position that it would never supply RCOA with production materials for albums.[10]

 However, even if UAR's actions could somehow be construed as clearly indicating to RCOA that UAR was willing to perform under the contract, UAR's retraction came too late. As section 2–611 makes clear, a repudiating promisor may not retract his repudiation after the aggrieved promisee has materially and detrimentally

changed his position as a result of the repudiation. In the instant case, RCOA materially and detrimentally changed its position when it ceased advertising UAR product.

 UAR next suggests that RCOA waived the repudiation by insisting that the agreement remained in force. This contention is without merit. In support of its position, UAR relies on a number of pre-code, common law decisions embodying what was known as the "election theory." *See e.g., Strasbourger v. Leerburger,* 233 N.Y. 55, 134 N.E. 834 (1922); *Hadfield v. Colter,* 188 A.D. 563, 177 N.Y.S. 382 (1st Dep't 1919). Under this theory, the promisee had the choice of treating the promisor's repudiation as a breach or ignoring it. If the promisee indicated a willingness to accept performance from the repudiator, as, for example, by urging him to carry out the contract, the offer was deemed to be rejected. This theory was much criticized as being unduly harsh, and it has been abandoned under the UCC. *See, e.g.,* 3 W. Hawkland, *Uniform Commercial Code Series* § 2–610:03, at 129 (1982); N.Y.U. C.C. § 2–610(b) (McKinney 1964); *id.* N.Y. annot.; *id.* § 2–703 comment 1. Thus, a promisee may resort to any remedy for breach even though he has notified the repudiating party that he will await performance and has urged retraction of the repudiation. N.Y. U.C.C. § 2–610(b) (McKinney 1964); J. Calamari & J. Perillo, *supra* p. 32, § 12–10, at 466–67. Consequently, RCOA's oral and written statements that it "had a firm contract" with UAR, and that the agreement was still "in

10. It would appear that in late September 1972, UAR's management committee decided to seek advice from outside counsel concerning the status of the license agreement, and that in late October 1972, UAR's outside counsel advised UAR to continue to service RCOA but to seek a declaratory judgment that the agreement had terminated. *See* Dx. 215, 216, 217. Even assuming that UAR's management committee decided to follow this advice, there was no retraction of UAR's repudiation.

To constitute a retraction, the repudiating party's words or conduct must "clearly indicate" to the aggrieved party that the repudiating party

intends to perform. N.Y.U.C.C. § 2–611 (McKinney 1964). The standard is an objective one. The repudiating party's intentions are irrelevant. Unless a "reasonable man" in the position of the aggrieved party would conclude that the repudiating party has clearly and unambiguously indicated that it intends to perform, there has been no retraction. *See* 3 W. Hawkland, *Uniform Commercial Code Series* § 2–611:01, at 136 (1982). For the reasons set forth in the text, I find that a "reasonable man" in RCOA's position would not have concluded that UAR had retracted its repudiation.

force" did not in any way waive or reject UAR's anticipatory repudiation.

 Finally, UAR suggests that RCOA's decision to cease advertising UAR product on August 2, 1972 was somehow inconsistent with RCOA's position that the agreement was still in full force and effect. I do not agree. Even when an aggrieved promisee chooses to hold a repudiating promisor to the contract and urges retraction, he must still take steps to mitigate his damages. J. Calamari & J. Perillo, *supra* p. 32, § 12–10, at 465–66; 4 A. Corbin, *Corbin on Contracts* § 983, at 945–46 (1951). The promisee must not perform if the effect of performance would be to enhance his damages. By ceasing its advertising of UAR product, RCOA was mitigating its damages. Based on UAR's shoddy performance under the contract from the beginning, and UAR's repeated unequivocal repudiations of the contract beginning June 6, 1972, RCOA had reason to doubt that it would receive UAR product under the license agreement. In light of the high cost of covering by purchasing UAR recordings from wholesale distributors, ceasing the advertising of UAR product minimized RCOA's losses.[11] RCOA could not continue to advertise UAR product and simply tell purchasers that it could not fill their orders for UAR items. UAR product amounted to almost 20 percent of RCOA's distribution at the time, and failing to fill 20 percent of its members' orders would have had a devastating effect on RCOA's business. *E.g.*, Tr. at 68. In addition, it would have been unethical or at least bad business practice for RCOA to continue advertising UAR product when it did not have a reasonable basis to believe it could obtain it. *See, e.g.*, Tr. at 112–13. And, had RCOA continued to advertise UAR product and incurred losses covering when it was unable to obtain the product in a timely fashion, UAR would doubtless urge the Court to disallow those losses as avoidable damages.

UAR suggests that RCOA was somehow acting inconsistently. However, RCOA's actions were quite consistent. UAR had repudiated the agreement. RCOA took the position that the contract was still in force, and urged UAR to perform. RCOA was required to mitigate its damages, and stopped advertising new UAR product in order to do so. Meanwhile, RCOA continued to place orders to satisfy responses to old advertising and took whatever product UAR would supply at whatever price RCOA could get. This too was in mitigation of RCOA's damages. RCOA soon commenced an action to enforce the contract. When UAR filled some orders, RCOA requested assurances that UAR would continue to perform. UAR refused to provide those assurances.

Indeed, it was UAR that was acting inconsistently. UAR told RCOA that the agreement was over and that it would stop servicing RCOA with new product unless RCOA entered into a new contract on terms substantially more favorable to UAR than those of the existing contract. Despite its unequivocal repudiation of the contract, UAR filled some orders anyway. RCOA then asked UAR for assurances that

---

11. During the six-month period preceding its decision to cease advertising UAR product, RCOA had been distributing approximately 55,000 UAR albums per month; 20,000 of these were sold, and 35,000 were given away on a free or bonus basis. Tr. at 72, 75. Under the license agreement, RCOA paid $1.20 for albums it sold and $0.80 for albums it distributed on a free or bonus basis. Tr. at 75; *see also supra* note 4 and accompanying text. To obtain the same albums on an unlicensed basis from a wholesale distributor would have cost from $2.90 to $5.33 per album, whether RCOA sold it or gave it away. Tr. at 47, 164. RCOA resold albums for prices ranging from $2.49 to $3.98 each. Tr. at

73. New members received three "free" albums and the right to make future purchases at RCOA's substantially discounted prices in return for their $5 membership fee. Tr. at 6.

Assuming that RCOA resold all UAR albums for its maximum price of $4 per album, its monthly gross profit, taking into account only direct costs, would be $(($4 - $1.20) \times 20,000) + ($5 \times (35,000/3)) - ($0.80 \times 35,000)$, or $85,000. Had RCOA been able to obtain the identical UAR product at the minimum wholesale price of $3, it would have incurred a *monthly loss*, taking into account only direct costs, of $(($4 - $3) \times 20,000) + ($5 \times (35,000/3)) - ($3 \times 35,000)$, or $27,000.

it would continue to fill orders. UAR did not respond for several months and then refused outright. The Court can only speculate why UAR continued filling RCOA's orders in the haphazard fashion it did. Perhaps UAR decided to "hedge its bets" and reduce the damages for which it would be liable if it turned out that UAR had erred. But UAR never gave RCOA any reason to believe UAR would live up to the terms of their agreement.

In sum, I find that RCOA proved by a preponderance of the evidence that UAR anticipatorily repudiated the license agreement as early as June 6, 1972. The repudiation was not justifiable, nor was it retracted or waived. Accordingly, UAR is liable for the damages arising out of its anticipatory repudiation. The amount of those damages will have to be determined after a trial on a date to be set by the Court.

Having concluded that UAR unjustifiably repudiated the license agreement, I turn to RCOA's second claim: that UAR actually breached the license agreement on a number of occasions. Of course, since UAR's repudiation constituted a total breach of the license agreement, it is of little import whether UAR also actually breached the license agreement. In either event, RCOA is entitled to the economic equivalent of full performance, but it may only recover once.

■ I conclude that RCOA established by a fair preponderance of the evidence that UAR actually breached the license agreement on a number of occasions. For instance, between August 24, 1972, and November 23, 1972, UAR failed to fill RCOA's orders for 18 different recordings. Px. 86; Tr. at 80. In addition, beginning in mid May 1973, RCOA placed numerous orders for interim master tapes for the duplication of cassette tapes and eight track cartridges. Tr. at 94–96, 198–203; Px. 51. Since RCOA had opened its own tape duplicating facility in February 1972, it was entitled to order production materials for tapes and cartridges and to duplicate these items itself. Px. 3 ¶ 9(ii). UAR never filled any orders for interim masters after

May 18, 1973. Tr. at 94–96, 198–203; Px. 51. Moreover, between July 1973 and November 1973, UAR shipped only 8,000 of 18,000 albums RCOA had ordered, and those that it did ship were shipped on a substantially delayed basis. Tr. at 96–97. Finally, I find that UAR repeatedly breached the agreement by failing to ship albums within fourteen days, given the fact that UAR had informed RCOA in no uncertain terms that it would never receive production materials with which to press albums. E.g., Px. 85, 90. In light of this blanket refusal, and the numerous specific requests for production materials that UAR had previously rejected, it would have been futile for RCOA to make additional requests for production materials. This is by no means an exhaustive list of UAR's actual breaches of the license agreement. It should be clear from the preceding discussion of RCOA's anticipatory repudiation claim that RCOA was not in material breach of the license agreement at the time of UAR's breaches. Viewed as a whole, these breaches totally destroyed the value of the license agreement to RCOA. Accordingly, RCOA is entitled to judgment in its favor on this ground as well as the previous one. Again, the amount of the damages RCOA sustained will be determined after a trial on a date to be set by the Court.

RCOA's third claim against UAR charges that UAR tortiously induced its wholly-owned subsidiary All Disc to breach All Disc's requirements contract with RCOA. Amended and Supplemental Complaint ¶¶ 34–37. It would appear that RCOA has abandoned this claim, since RCOA does not address this point in its posttrial memoranda or its proposed findings of fact and conclusions of law. Nonetheless, I conclude that RCOA did not establish by a fair preponderance of the evidence that UAR tortiously induced All Disc to breach its contract with UAR.

The elements of a claim of tortious interference with contract are: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defend-

ant's intentional procurement of a breach of the contract by the third party; and (4) damages caused by the breach. *Conniff v. Dodd, Mead & Co.*, 593 F.Supp. 266, 269 (S.D.N.Y.1984) (citing *Martin Ice Cream Co. v. Chipwich, Inc.*, 554 F.Supp. 933, 945 (S.D.N.Y.1983)). However, it is well established that under certain circumstances a third party may be privileged to interfere in the contractual relations of others. *See, e.g.*, W. Prosser, *Handbook of the Law of Torts* § 129, at 942–45 (4th ed. 1971). Under New York law, a parent company has the privilege of interfering with a contract between its subsidiary and the plaintiff so long as the parent company does not use illegal means or is not motivated by malice toward the plaintiff. *Felsen v. Sol Cafe Mfg. Corp.*, 24 N.Y.2d 682, 686–87, 249 N.E.2d 459, 461, 301 N.Y.S.2d 610, 613 (1969); *see also Conniff*, 593 F.Supp. at 269.

As I indicated above, I entertain some doubts as to whether UAR acted in good faith in anticipatorily repudiating the license agreement. However, I do not think that RCOA proved by a preponderance of the evidence that UAR employed illegal means or was motivated by malice in notifying All Disc in October 1973 that the license agreement had terminated or in instructing All Disc to cease filling RCOA's orders. Accordingly, RCOA's claim against UAR for tortious interference with its contractual relationship with All Disc is dismissed.

*Conclusion*

As set forth above, I conclude that UAR unjustifiably repudiated its license agreement with RCOA, and that its repudiation was not retracted or waived. I also conclude that UAR actually breached the li-

cense agreement on a number of occasions. The amount of RCOA's damages will have to be determined after a trial on a date to be set by the Court.[12] RCOA did not prove its tortious interference claim and that claim is therefore dismissed. The parties are directed to appear for a conference on Friday, September 19, 1986 at 11:00 A.M. in Courtroom 618.

SO ORDERED.

---

**12.** UAR asserted two counterclaims in its answer to RCOA's amended and supplemental complaint. In its first counterclaim, UAR seeks the $120,000 guaranteed minimum royalty for the first two-year option period. In the second, UAR seeks to set off a $866,394.77 claim of Capitol Records, UAR's successor in interest by merger, against any amount RCOA recovers in this action.

UAR has not addressed either of these counterclaims in its posttrial memoranda, nor has it supplied the Court with proposed findings of fact and conclusions of law with respect thereto. I assume, therefore, that UAR has either abandoned these counterclaims, or considers them part of the damage issues which have yet to be tried.