**RECORD CLUB OF AMERICA, INC., Plaintiff,**

v.

**UNITED ARTISTS RECORDS, INC., Defendant.**

**No. 72 Civ. 5234 (WCC).**

United States District Court, S.D. New York.

June 17, 1985.

Nancy G. Grossman, New York City, for plaintiff.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendant; Janet P. Kane, Robert B. Weintraub, New York City, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

This diversity action was commenced in 1973 by plaintiff Record Club of America, Inc. ("RCOA"), a Delaware corporation engaged in the business of manufacturing and distributing mail-order records and tapes, against United Artists Records, Inc. ("UAR"), a California corporation with which plaintiff had entered into a 1970

licensing agreement.[1] Plaintiff asserted in its original complaint that UAR had breached the licensing agreement. Subsequently, however, plaintiff amended the complaint to allege a claim of antitrust violations against defendant, and another claim that UAR had tortiously induced two of its subsidiaries to breach related agreements with RCOA.

Before the Court today is defendant's motion for partial summary judgment on the antitrust and tortious inducement claims. For the reasons below, the motion is granted in part and denied in part.

This action has a somewhat complicated procedural history which need not be set forth in detail here. The following summary of undisputed facts is helpful, however, for purposes of placing the instant dispute in context:

The controversy finds its roots in 1970, when plaintiff filed two actions against UAR and other record companies, alleging violations of the Sherman Act. In voluntary settlement of the claims against UAR, the parties entered into three contracts, all of which took effect on October 1, 1970. Under the first contract ("the license agreement"), UAR granted to RCOA a renewable three-year non-exclusive license to produce, advertise and sell by mail-order all records and tapes manufactured and distributed by UAR. RCOA agreed to make quarterly royalty payments on all albums and tapes it sold, and to make certain minimum payments. Under the other two agreements ("the side agreements"), RCOA agreed that during the term of the license agreement, it would purchase UAR's catalogue of long-playing records from a wholly-owned record-manufacturing subsidiary of UAR called All-Disc Records, Inc. ("All-Disc"), and that it would purchase eight-track and cassette tapes from another wholly-owned subsidiary, Liberty/UA Tape Duplicating, Inc. ("Liberty Tape").

On January 2, 1972, RCOA entered into an Agreement of Settlement and Release with UAR and its affiliates. Ex. 2 to Def. Mem. of July 16, 1984. This agreement recited that UAR had been named as a defendant in the two antitrust suits, and that in consideration of the parties' execution of the 1970 licensing agreement, RCOA would dismiss its claims against UAR, and the parties would exchange mutual releases. The Agreement of Settlement and Release then provided that RCOA released and forever discharged UAR and its affiliates from all antitrust claims and similar causes of action arising out of any transaction or occurrence connected with or in any manner related to the underlying lawsuit.

In late 1972, a dispute arose over how and when certain royalties were to be calculated and paid under the licensing agreement. Defendant filed an action against plaintiff in California, alleging that RCOA had failed to pay these royalties on time. RCOA then filed an action in this Court, seeking an order confirming that its obligation to pay the royalties in question had not yet arisen. These actions were consolidated before me. Shortly thereafter, RCOA raised two additional claims: it asserted that UAR had tortiously induced its subsidiary All-Disc to breach the side agreement with RCOA, and that UAR had committed antitrust violations.

In December 1974, before these issues were resolved, plaintiff commenced Chapter 11 proceedings. At the request of a court-appointed receiver, this action was transferred to the Court's suspense docket, where it remained until 1982, when RCOA emerged from bankruptcy and requested that the matter be restored to the active calendar. The Court granted that request and subsequently held a pretrial conference on March 16, 1983. At that conference, the Court reviewed the complaint and directed RCOA to replead its antitrust claim. A week later, RCOA filed an "Amended and Supplemental Complaint" asserting five grounds for relief.

In the amended complaint plaintiff seeks: (1) damages resulting from UAR's anticipa-

---

1. Prior to February 25, 1971, UAR was called "Liberty/UA, Inc."

tory breach of the licensing agreement in 1972; (2) a declaratory judgment that plaintiff effectively renewed the contract for a two-year period commencing in 1973, and thereby obtained an option for a second renewal period under the agreement;[2] (3) damages for UAR's breaches of the agreement during the years 1973 through 1977; (4) damages for All Disc's breach of the side agreement with RCOA, which allegedly was tortiously induced by UAR; and (5) treble damages for UAR's unreasonable restraint of trade in violation of the Sherman Act.

On November 14, 1983, defendant moved for partial summary judgment on the fourth and fifth claims raised in the amended complaint. Thus, only the tortious inducement and antitrust causes of action are relevant to the Court's considerations today. Arguments surrounding the antitrust allegations have consumed the vast majority of the parties' voluminous submissions, and I therefore address these issues first.

*The Antitrust Claim*

The Sherman Act claim alleges that from October 1, 1970 through 1978, UAR and All-Disc combined and conspired with each other, with Liberty Tape, and with "other co-conspirators known and unknown," to coerce RCOA to enter into the two side agreements with UAR's subsidiaries, thus unreasonably restraining RCOA's freedom to manufacture albums and tapes on more favorable economic terms, such as those enjoyed by RCOA's competitors. According to plaintiff, this conduct violated § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*, insofar as it represented a conspiracy in restraint of trade.

Defendant's initial position was that it was entitled to summary judgment on the antitrust claim on the ground that UAR and its wholly-owned subsidiaries constituted a single integrated enterprise, and therefore there were no independent entities capable of conspiring within the mean-

ing of § 1 of the Sherman Act. In response, RCOA denied that UAR, All-Disc and Liberty Tape were sufficiently integrated to foreclose conspiracy liability under the Sherman Act. RCOA asserted, in addition, that even if UAR were found to be legally incapable of conspiring with its wholly-owned subsidiaries, summary judgment would still be inappropriate because: (1) the complaint also alleged that UAR had conspired with other parties; and (2) the allegations that UAR had required RCOA to purchase records and tapes from its subsidiaries instead of from competitors described an illegal tying arrangement, which also violated § 1 of the Sherman Act. According to RCOA, UAR used its ownership of performance rights, copyrights and trademarks to coerce RCOA into accepting the related manufacturing services of All-Disc and Liberty Tape. The tying theory involves no conspiracy, but rather, a contract in restraint of trade.

UAR replied that RCOA had failed to present sufficient competent evidence of a conspiracy with others to survive a summary judgment motion, and that RCOA could not prevail on its tying theory because UAR's conduct was protected as a legitimate exploitation of its copyright privilege. UAR argued, finally, that RCOA entered into the side agreements voluntarily, and therefore could not establish the coercion element of a tying claim.

After the matter was fully submitted, the Court advised the parties by letter dated June 28, 1984 that only days earlier, the United States Supreme Court had held in *Copperweld Corp. et al. v. Independence Tube Corp.*, — U.S. —, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), that a parent corporation and its wholly-owned subsidiary were legally incapable of conspiring in violation of § 1 of the Sherman Act. In this letter, the Court expressed its view that *Copperweld* disposed of the claim that UAR conspired with All-Disc and Liberty

---

**2.** The parties agree that the second part of this claim for relief was mooted by my oral ruling at an April 22, 1983 conference.

Tape;[3] the Court also invited the parties to submit any additional arguments they deemed appropriate in light of the Supreme Court's decision in *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), which discussed illegal tying arrangements. This invitation was enthusiastically accepted and a new barrage of briefs and letters soon followed.

During this subsequent round of arguments on the tying claim, two important propositions surfaced quite suddenly. First, RCOA came to the startling realization that the UAR sound recordings in issue were not copyrighted at all. UAR reluctantly conceded this issue, dropping its "legitimate exploitation" argument. Second, UAR raised *for the first time* its claim that RCOA's antitrust cause of action was barred by the 1972 Agreement of Settlement and Release.[4] Because I agree with defendant that the antitrust claim is barred, I need not reach the questions of whether the side agreements constituted illegal tying arrangements, and whether there is competent evidence of a conspiracy between UAR and other independent record companies.

As indicated above, the Agreement of Settlement and Release was executed in 1972, in settlement of RCOA's two 1970 lawsuits against UAR. The document incorporated by reference the licensing agreement entered into in 1970, and stated that in consideration of execution of that licensing agreement, RCOA had agreed to dismiss UAR from the pending lawsuits and execute a release. The release provision of the 1972 Agreement of Settlement and Release is set forth in pertinent part below:

> Record Club does ... release and forever discharge the [UAR] Defendants, ... and each of their affiliated companies, ... from all claims, actions, causes of action, suits, ... contracts, controversies, agreements, promises, representations, restitutions, damages and demands by Record Club for, upon, or by reason of any fact, act, matter, transaction, cause or thing whatsoever connected with, referred to in, or in any manner asserted or involved with, the claim against the [UAR] Defendants in the Subject Lawsuits *or any related matter* under the antitrust or similar laws, by Record Club, from the beginning of the world to the date hereof....

Ex. 2 to Def. Additional Mem. of July 16, 1984 at ¶ 2. (emphasis added).

It is difficult to imagine a release provision with broader language than this, and yet RCOA argues now that its antitrust claim is not barred. RCOA notes that the two original antitrust suits brought against UAR were based on the fact that UAR had previously had exclusive licensing contracts with a competitor of RCOA's and that the language immediately preceding the release provision in the Agreement of Settlement and Release indicates that the parties had "agreed to exchange mutual releases with respect to the subject matter of the Subject Lawsuits." RCOA argues that the release provision itself "goes on to limit the release to the subject matter of those 'exclusive dealing' antitrust lawsuits," and that since the claim of an illegal tying arrangement was not part of the exclusive dealing claim raised in the original lawsuits, it is not covered by the release.

The above-quoted provision could not, under any reasonable construction, be interpreted as limiting the release to the issues raised in the underlying lawsuits. Indeed, the release specifically and unambiguously covers any claim arising out of any matter "connected with" or "related" to those lawsuits. The allegation that

---

3. Plaintiff subsequently conceded that *Copperweld* disposed of this question. *See* Pl. Additional Mem. at 7.

4. Defendant's delay in raising this defense is inexplicable. In September of 1983, an answer to the Amended and Supplemental Complaint was filed by Capitol Records, Inc., the successor in interest through corporate merger to UAR. The answer asserted, as a seventh affirmative defense, that RCOA's execution of the 1972 release barred the antitrust claim against defendant.

UAR coerced RCOA into an illegal tying arrangement is obviously a "claim" within the meaning of the release; it is based upon agreements executed in settlement of the underlying lawsuits and is therefore "related" to those lawsuits;[5] it is brought under antitrust laws; and, needless to say, it arose during the period from the beginning of the world to the date the settlement agreement was executed. It is therefore apparent to me, on the basis of the clear language of the release, that RCOA's interpretation of the release is fanciful at best.

■ Of course, a settlement agreement containing a release provision may be unenforceable, just like any other contract, if it was secured through duress or coercion. *Citibank, N.A. v. Real Coffee Trading Co.,* 566 F.Supp. 1158 (S.D.N.Y.1983). RCOA has not asserted duress here, however, and I would not sustain such a challenge to the operation of the release had it attempted to do so.

■ RCOA *has* claimed duress/economic coercion as an element of its illegal tying claim, and the record contains a 1970 letter from UAR to RCOA indicating that operation of the licensing agreement and the two side agreements was subject to execution of the release. On this basis, plaintiff could perhaps have argued that since the license was illegally conditioned on the side agreements, and all three agreements were conditioned on execution of the release, the release was coerced.[6] However, even if I ignore the fact that the release was signed more than a year after the contracts became effective, and even if RCOA could persuade me that UAR coerced it into releasing UAR from liability for claims raised in the original antitrust suit, it would strain credulity to suggest that RCOA had no practical alternative but to execute a release with such extraordinarily broad language.[7] Plaintiff's alternative was to tailor a narrower release; had it done so, the present claims might not be barred.

I can only presume that the Agreement of Settlement and Release was drafted and executed by competent attorneys who were well aware of the meaning of the contractual language. In hindsight, counsel for

---

**5.** The Agreement of Settlement and Release expressly incorporates only the licensing agreement between RCOA and UAR; the side agreements are not specifically mentioned. Nonetheless, it is beyond question that execution of the side agreements was integrally related to execution of the licensing agreement, that the three contracts were entered into simultaneously, and that all three contracts were therefore "related" to the underlying antitrust lawsuits. *See* Pl. 3(g) Stmt. at ¶ 33; Def. 3(g) Stmt. at ¶ 33.

**6.** I note, in passing, the skepticism with which I view the merits of plaintiff's illegal tying claim. As the Supreme Court has clearly stated, an essential characteristic of an invalid tying arrangement is the seller's ability to *force* the buyer into the purchase of a tied product he might have preferred to purchase elsewhere. Notwithstanding the need for plaintiff to show coercion, it has conceded at ¶ 33 of its Local Rule 3(g) statement that RCOA entered into the agreements with UAR, All-Disc and Liberty Tape "in voluntary settlement of its claims against UAR in the 1970 litigation."

Moreover, although I need not and do not decide the merits of the tying claim, I am impressed with the reasoning of Judge Friendly in *Martina Theatre Corp. v. Schine Chain Theatres, Inc.,* 278 F.2d 798 (2d Cir.1960), a case cited by

defendant in support of its argument that there was no coercion because plaintiff's clear alternative to entering into the side agreements was to proceed to trial. The court said in *Martina Theatre Corp.:*

> We ... cannot accept plaintiff's second suggested ground, of duress. For the financial hardship alleged to have forced plaintiff to accept the settlement flowed from the same alleged unlawful practices that were the subject of the plaintiff's claim. A court was ready to determine this. Every settlement reflects the parties' balancing of the strength of their positions against the expenditure of time, money, and effort required to establish them. Threats by a defendant of deliberate delays and obstructions in the suit might present a different case.... However, it would seriously and needlessly impair the utility of settlement to allow a plaintiff to attack a settlement merely because the financial injury alleged in its initial cause of action may have been serious.

*Id.* at 802.

**7.** In order to show duress, the circumstances "must be such that the party asserting the defense had no practical alternative open to him." *Korn v. Franchard Corp.,* 388 F.Supp. 1326, 1333 (S.D.N.Y.1975).

plaintiff might well wish these words had been more carefully chosen; nonetheless, this contract will not be voided upon a showing that it was improvidently entered. Accordingly, I conclude that the release operates to bar plaintiff from prosecuting this antitrust claim against defendant.[8]

*The Tortious Inducement Claim*

RCOA asserts a fourth cause of action for tortious inducement of breach of contract. In stating this claim, plaintiff alleges that in mid-1972, UAR accused RCOA of having breached the 1970 licensing agreement, that UAR notified RCOA of its contention that the licensing agreement was terminated, and that UAR threatened to direct its subsidiary, All-Disc, to cease supplying RCOA with records under the side agreement unless RCOA agreed to execute a new contract. RCOA further alleges that it did not breach the licensing agreement with UAR, that nonetheless All-Disc failed to fill plaintiff's orders during the period from 1973 to 1977, that this refusal constituted a breach of the side agreement between RCOA and All-Disc, that this breach was "tortiously and wilfully induced by UAR" and that RCOA suffered damages as a result of this breach.

Defendant has moved for summary judgment on the ground that "a parent corporation cannot tortiously induce the breach of—and, indeed, is privileged to interfere in—the contractual relationships of a wholly-owned subsidiary." Def.Mem. in Support of Motion for Partial Summary Judgment at 25. In support of this position, UAR relies chiefly on *Felsen v. Sol Cafe*

*Mfg. Corp.*, 24 N.Y.2d 682, 301 N.Y.S.2d 610, 249 N.E.2d 459 (1969), which it characterizes as "dispositive." In my view, neither *Felsen* nor the other authorities cited by defendant establish this unconditional proposition.

 Under New York law, one who has a financial interest in the business of another is privileged to interfere with a contract between the other and a third party *if* his purpose is to protect his own interests and if he does not employ improper means. *Felsen, supra*, 301 N.Y.S.2d at 612, 249 N.E.2d 459. A parent corporation that is motivated by malice toward a plaintiff, or that uses fraudulent or illegal means, is not immune from liability. *Id.; see also Coniff v. Dodd, Mead & Co.*, 593 F.Supp. 266, 269 (S.D.N.Y.1984).[9]

 There are documents in the record tending to suggest that All-Disc's failure to supply RCOA reflected UAR's belief that RCOA was in default of its contractual obligations, and that UAR might never receive payments due. Defendant has not explained the significance of these documents, however, and I simply cannot conclude that there is no dispute as to whether UAR's conduct was fraudulent or malicious. Resolution of this issue may well turn on the subjective intent of individuals at UAR, and the Court of Appeals for the Second Circuit has repeatedly cautioned district judges not to grant summary judgment where intent is an element of the claim. Accordingly, the motion is denied.

SO ORDERED.

---

8. I note that the complaint alleges illegal conduct extending past the date of the release. I do not believe this presents any problem under the release, however, because all of the harm alleged flows from and is related to the terms and conditions under which RCOA settled the original antitrust lawsuits. In other words, there may have been a continuing effect, but plaintiff's cause of action arose before the release was signed.

9. Technically speaking, plaintiff's amended complaint may be insufficient insofar as it fails specifically to allege either malice or improper means. *See Felsen, supra* (In action for tortious inducement to breach employment contract, plaintiff employee presented no proof of malice

at trial and therefore failed to make out a *prima facie* case against defendant, the sole shareholder of employer). However, the clear thrust of plaintiff's claim, as gleaned from the affidavits and memoranda, is that UAR wrongly accused plaintiff of breaching the licensing agreement, and subsequently induced All-Disc to breach the side agreement, in order to deprive RCOA of any benefit gained from its settlement of the antitrust lawsuit. In light of my view that inadequate pleadings, affidavits and memoranda abound in this action, it seems to me that no useful purpose would be served by requiring plaintiff to file another amended complaint at this late date.