**RECORD CLUB OF AMERICA, INC., Plaintiff,**

v.

**UNITED ARTISTS RECORDS, INC., Defendant.**

**No. 72 Civ. 5234 (WCC).**

United States District Court, S.D. New York.

Dec. 7, 1987.

Nancy G. Grossman, McGuire & Tiernan, New York City for plaintiff; Harold F. McGuire, of counsel.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendant; Janet P. Kane, David Given, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

This case is before the Court on cross-motions for summary judgment following a trial on the issue of liability. In an opinion and order dated September 8, 1986, it was ruled that defendant United Artists Records, Inc. ("UAR") unjustifiably repudiated and actually breached its license agreement with plaintiff Record Club of America, Inc. ("Record Club"). *Record Club of America v. United Artists Records*, 643 F.Supp. 925 (S.D.N.Y.1986) ("*Liability Decision*"). The parties are currently in discovery in preparation for a trial on damages. Defendant has moved to preclude plaintiff from recovering damages for any period subsequent to September 30, 1973, the date that the initial term of the license agreement between plaintiff and defendant expired. Plaintiff has moved for dismissal of two of defendant's claimed setoffs. For the reasons set forth below, plaintiff's motion and defendant's motion are both denied.

### I. *Facts*

The facts set forth below are a summary of the Court's findings in the *Liability Decision,* supplemented with those facts that the supporting affidavits show are not in dispute.[1]

### A. *The Underlying Contracts*

On October 1, 1970, Record Club and UAR entered into three interrelated contracts. The first contract was a license agreement pursuant to which UAR granted Record Club a renewable, nonexclusive license to advertise, manufacture and distribute UAR licensed recordings by mail-order. The agreement provided for an initial term of three years with two two-year option periods. To exercise the option Record Club had to notify UAR in writing 90 days prior to the expiration of the current term, and Record Club was required to pay a guaranteed royalty of $15,000 on or before October 1, 1973.

The license agreement permitted Record Club to sell UAR licensed recordings to its existing members and to distribute UAR licensed recordings free to prospective members. Record Club was required to pay a royalty on all licensed albums sold under the agreement and on all "excess frees." Excess frees were those units given away in excess of fifty percent of the total number of units distributed, whether sold or given away. Royalties on recordings that Record Club sold were due on a quarterly basis. Royalties on excess frees were not due until the end of each term. The agreement required Record Club, within 45 days after the end of each calendar year quarter, to furnish to UAR a complete and accurate royalty statement for the quarter. Each statement was required to show, with respect to each UAR licensed recording, itemized by catalog number, the list price, royalties earned, total number sold, and total number otherwise distributed.

The other two agreements were requirements contracts between Record Club and two wholly-owned subsidiaries of UAR— All Disc Records, Inc. ("All Disc"), and Liberty/UA Tape Duplicating, Inc. ("Liberty Tape"). Under the All Disc contract, Record Club agreed, with two exceptions, to purchase from All Disc all UAR licensed recordings that Record Club wished to distribute in the form of phonograph records. Record Club was entitled to have another record pressing company manufacture those selections that All Disc was unable to deliver within fourteen business days from receipt of Record Club's order. This provision was essential to the contract since

---

1. For a more detailed recitation of the facts see the opinion and order on the liability issue, 643 F.Supp. at 928–36.

Record Club required prompt delivery to assure that it would have advertised recordings in stock when it received orders from its members. In addition, Record Club was entitled to manufacture UAR licensed records itself after the end of the first contract year if it opened its own record pressing plant. Under the Liberty Tape contract, Record Club agreed, with similar exceptions, to purchase from Liberty Tape all UAR licensed recordings that Record Club wished to distribute in the form of cassette tapes and eight-track cartridges.

Record Club also entered into a license agreement with Capitol Records, Inc. ("Capitol"), and as a result of this agreement Record Club incurred a liability to Capitol. UAR and Capitol merged into one corporate entity in 1981, and in the present proceeding UAR is asserting Capitol's rights under Capitol's contract with Record Club.

## B. *Repudiation and Breach*

From the start, UAR's performance of its contractual obligations was less than satisfactory. At the height of the 1970 Christmas season, Record Club experienced significant delays in obtaining UAR recordings from All Disc. Record Club objected, explaining that it could not wait more than 14 days for the albums it ordered, and notified UAR that it could not continue to advertise UAR products as it had been doing if it could not count on having UAR records in stock when it received orders from its members. Nevertheless, the following year Record Club again experienced severe delays in obtaining UAR products from All Disc. In addition, beginning in the latter part of 1971 and continuing into the early part of 1972 UAR failed to provide Record Club with samples of new releases as required by the license agreement. Record Club complained anew but to no avail.

On May 18, 1972, UAR informed Record Club that Record Club was in breach of the license agreement because of Record Club's failure to maintain its books and records in an accurate manner. In addi-

tion, UAR charged that Record Club had not paid quarterly royalties on excess frees as was required under the license agreement, and that as a result Record Club owed $65,000 in royalties on excess frees for the period ending June 30, 1971. UAR also charged that Record Club was distributing too many UAR recordings on a free or bonus basis. Consequently, on June 6, 1972, after numerous communications, UAR notified Record Club that the agreement was terminated due to Record Club's breaches. UAR reiterated this position in several subsequent communications.

## C. *Prior Proceedings*

In December 1972, Record Club commenced this action against UAR alleging that UAR had actually and anticipatorily breached the license agreement. Record Club sought a declaration that the agreement remained in full force and effect, and preliminary and permanent injunctive relief requiring UAR to supply it with the production materials necessary for it to manufacture UAR licensed recordings. At about the same time UAR filed a declaratory judgment action against Record Club in the District Court for the Southern District of California. The California action was subsequently transferred to the Southern District of New York and consolidated with this action.

Both UAR and Record Club moved for summary judgment. There were two questions before the Court: first, whether Record Club had properly exercised its option to renew the agreement, and second, whether Record Club had breached by failing to pay royalties on excess frees on a quarterly basis. As discussed above, the license agreement gave Record Club the option of extending the agreement for an additional two years from October 1, 1973 to September 30, 1975. The option was to be exercised on or before July 2, 1973. In light of UAR's insistence that the license agreement had terminated and in view of the pending litigation, Record Club considered it futile to exercise the option. Record Club later reconsidered, however, and attempted to exercise the option, both

orally and in writing, in August and September 1973. UAR refused to honor the late exercise of the option.

In an opinion and order dated July 30, 1974, the Court held that Record Club's late exercise of the option was effective to extend the license agreement. *Id.* at 16–17, 22. The Court also held that royalties on "excess free" distribution were not due on a quarterly basis as UAR had claimed. *Record Club of Am., Inc. v. United Artists Records, Inc.*, No. 72 Civ. 5234 (WCC), slip op. at 17–19. Accordingly, October 11, 1974 the Court ordered an accounting following which judgment would be entered against Record Club for the royalties accruing on its distributions of excess free and bonus records during the period from October 1, 1970 through July 27, 1972. Under the terms of the accounting Record Club was to provide a royalty statement in the form specified in the license agreement within 30 days of the entry of the order. UAR thereafter had the right to verify the royalty statement within 30 days of receiving the statement. If the parties were still unable to agree on the amount of royalties owing, either could move for a hearing to fix the amount.

On December 23, 1974, Record Club filed a petition in the Bankruptcy Court for the Middle District of Pennsylvania under Chapter 11 of the Bankruptcy Act. At the request of the court-appointed receiver, this action was transferred to the Court's suspense docket, where it remained until 1982, when Record Club emerged from bankruptcy and requested that the matter be restored to the active calendar.

In the bankruptcy proceeding, UAR and Capitol filed separate proofs of claim against Record Club. Capitol's claim was provisionally allowed in the amount of $805,123.42 subject to Record Club's defenses and counterclaims. Those defenses and counterclaims are still pending. UAR filed two proofs of claim. One, filed on behalf of two subsidiaries, was dismissed with prejudice for failure to provide discovery. The other, a claim for money owed under the license agreement was allowed in the amount of $179,759.66. UAR did not file a claim for any aggregate guaranteed royalties respecting the first option period of the agreement. The Bankruptcy Court issued an order confirming Record Club's plan of arrangement on June 18, 1982. That order became final after appeal. The order did not provide for the preservation of any claim against Record Club.

On March 24, 1983, Record Club filed an amended and supplemental complaint in which it added a claim that UAR had tortiously induced All Disc to breach its requirements contract with Record Club, and a claim that UAR had violated the antitrust laws. In late 1983, UAR moved for summary judgment on the tortious interference and antitrust claims. The Court granted UAR's motion for summary judgment on the antitrust claim but denied its motion for summary judgment on the tortious interference claim. 611 F.Supp. 211. Following the ensuing bench trial, the Court ruled that UAR unjustifiably repudiated and actually breached its license agreement with Record Club, and dismissed the tortious interference claim. 643 F.Supp. 925.

## II. *Discussion*

### A. *Defendant's Motion*

Defendant's motion for partial summary judgment seeks to preclude plaintiff from recovering damages for any period subsequent to the expiration of the initial term of the license agreement on September 30, 1973. Defendant makes three arguments in support of this motion.

#### 1. *The guaranteed minimum royalty*

Defendant argues that the agreement obligated plaintiff to pay a guaranteed minimum royalty on or before October 1, 1973 to exercise the option to extend the license agreement for a two-year term. Plaintiff does not dispute this contention, but plaintiff asserts that this obligation was excused by defendant's prior repudiation. Plaintiff further asserts that due to the prior repudiation it had the right to hold the guaranteed minimum royalty as a setoff against damages.

In *DeForest Radio Tel. & Tel. Co. v. Triangle Radio Supply Co.*, 243 N.Y. 283,

153 N.E. 75 (1926) the New York Court of Appeals wrote the definitive opinion on both of these issues. *DeForest,* which was decided by a panel that included both Judges Cardozo and Pound, involved a defendant who had agreed to distribute plaintiff's radios. Plaintiff repudiated the agreement. Despite the repudiation and the fact that it was never retracted, defendant insisted the agreement was still in effect.

When, post-repudiation, payment became due for radios delivered pre-repudiation, the defendant refused to pay and held the money as an offset to damages. Plaintiff sued for the purchase price of the radios, and defendant counterclaimed for damages resulting from plaintiff's repudiation.

Addressing itself to the defendant's counterclaim, the Court of Appeals stated:

> To the defendant's demand for damages [plaintiff] has but one defense, and that is the non-payment of a sum of money coming due after the breach. Payment, it says, should have been made in face of the continuing breach, even though the plaintiff would be under the duty in lay and good morals to pay it back to the defendant as damages. This defense finds no support in law or in reason.
>
> Where one party to a contract repudiates it and refuses to perform, the other party by reason of such repudiation is excused from further performance, or the ceremony of a futile tender.

243 N.Y. at 293, 153 N.E. at 78.

In the liability decision, the Court held that UAR repudiated the license agreement as early as June 6, 1972—well before the October 1, 1973 date on which the minimum guaranteed royalty became due. Record Club, therefore, like the defendant in *De-Forest,* did not breach the agreement by failing to make the post-repudiation payment, and was entitled to hold the guaranteed minimum royalty as a setoff.

■ UAR attempts to distinguish *De-Forest* on the basis of Record Club's alleged unwillingness and inability to perform its obligations under both the license agreement and the Court's order of Octo-

ber 11, 1974. This argument fails for two reasons.

First, it is wrong on the law. Although a repudiation will not excuse performance when the non-repudiating party is unable to prove it is ready, willing, and able to perform, *United States v. Penn Foundry & Manufacturing Co.,* 337 U.S. 198, 210, 69 S.Ct. 1009, 1015, 93 L.Ed. 1308 (1949); *DeForest,* 243 N.Y. at 293, 153 N.E. at 78; *Ufitec S.A. v. Trade Bank and Trust Co.,* 21 A.D.2d 187, 190, 249 N.Y.S.2d 557, 560 (1st Dep't 1964), *aff'd,* 16 N.Y.2d 698, 261 N.Y.S.2d 893, 209 N.E.2d 551 (1965); 4 Corbin on Contracts § 978, at 925 (1951), the willingness and ability to perform need not continue after the repudiation. 4 Corbin on Contracts § 978 at 925 (1951); 22 N.Y.Jur.2d Contracts § 367 at 263 (1982). All of UAR's assertions relate to Record Club's willingness, ability and preparedness to perform subsequent to UAR's repudiation. Therefore, these assertions are irrelevant to Record Club's damage claim.

■ Second, UAR has failed to make the necessary showing. Under Rule 56(c), Fed. R.Civ.P., the moving party on a motion for summary judgment must demonstrate that their is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." UAR has submitted an affidavit in support of its motion in which it asserts: (1) Record Club violated the Court's October 11, 1974 order thereby demonstrating its unwillingness to perform, Kane Reply Aff. ¶¶ 9–12; (2) Record Club's 1974 bankruptcy filing demonstrates an inability to perform, *Id.* at ¶ 14; and (3) Record Club's tax returns demonstrate an inability to pay the $15,000 advance guarantee for the quarter ending December 30, 1974. *Id.* at ¶ 15.

The order of October 11, 1974 obligated Record Club to submit an accounting to UAR regarding royalties on excess bonus and free recordings distributed up to July 27, 1972. UAR asserts that Record Club never submitted the required accounting. Reply Affidavit of Janet P. Kane, ¶ 8 ("Kane Reply Aff."). Record Club's president Sigmund Friedman, however, states

by affidavit that Record Club submitted the required accounting. Affidavit of Sigmund Friedman, ¶ 7 ("Friedman Aff."). Mr. Friedman's affidavit makes clear that there are significant, genuine issues of fact as to Record Club's compliance with the order.

Significant issues of fact exist with respect to both the bankruptcy and the guaranteed minimum royalty as well. Mr. Friedman's affidavit contains extensive evidence of Record Club's ability to pay the guaranteed royalty and to perform its contractual obligations during the pendency of the bankruptcy case. Friedman Sur-reply Affidavit, ¶¶ 30–36, 24–29. Consequently, UAR has not shown that it is entitled to summary judgment on this issue.

## 2. *Royalties on records sold*

■ Defendant contends that plaintiff was in material breach of the license agreement by reason of its failure to pay for licensed recordings sold during the initial term of the agreement. *DeForest* is controlling here as well. The payment for recordings sold could not have become due until November 15, 1973. As discussed above, this Court has previously held that defendant repudiated the agreement as early as June 6, 1972. Consequently, under *DeForest,* defendant's prior repudiation excused plaintiff from further performance and plaintiff was entitled to withhold the payment as a setoff.

## 3. *Defendant's inequitable conduct*

■ Defendant asserts that plaintiff's inequitable conduct bars his recovery of damages for the option period. UAR reasons that since the Court's order extending the agreement was premised on the Court's equitable powers, and since that order imposed corresponding obligations on plaintiff, plaintiff had an equitable duty to perform those obligations. UAR contends that Record Club is attempting to take advantage of the provisions of the order while at the same time repudiating the obligations thereby imposed. UAR concludes that this violates the equitable maxim that "one who seeks Equity's assistance

must stand before the court with clean hands." *Johanna Farms, Inc. v. Citrus Bowl, Inc.,* 468 F.Supp. 866, 874 (E.D.N.Y. 1978).

As discussed above, Record Club disputes the assertion that it violated the Court's order as to the accounting. This dispute as to the sufficiency of the accounting is material to UAR's request for equitable relief. UAR has not convinced the Court that Mr. Friedman's assertions are other than genuine. Consequently, defendant has not made the necessary showing on this issue either.

■ Moreover, even if there was no dispute as to the sufficiency of Record Club's accounting, summary judgment would be inappropriate on this ground, for under New York law the full life of an agreement includes subsequent option periods even when the option is not exercised. *See Koufakis v. Carvel,* 425 F.2d 892, 908–10 (2d Cir.1970); *Matter of Port of N.Y. Auth.,* 2 N.Y.2d 296, 301, 159 N.Y.S.2d 825, 827, 140 N.E.2d 740, 742 (1957). This result is particularly appropriate here since Record Club's failure to exercise the option within the contractually agreed deadline was in large part the result of UAR's prior repudiation. *See Liability Decision,* 643 F.Supp. at 934. Thus, even if the Court had not exercised its equitable powers to recognize Record Club's late exercise of its option, Record Club would be entitled to claim damages for the option period on the basis of UAR's prior repudiation. Accordingly, defendant's motion for summary judgment is denied.

## B. *Plaintiff's Motion*

Defendant has asserted two setoffs—one for $805,123.42, and the other for $120,000. Plaintiff's motion for partial summary judgment seeks an order denying defendant's claimed setoffs.

■ Record Club argues that its discharge in bankruptcy bars UAR's $120,000 setoff for guaranteed royalties. Under § 371 of the Bankruptcy Act, 11 U.S.C.

§ 771 (repealed 1978),[2] the confirmation of a plan of arrangement discharges a debtor from all unsecured debts and liabilities except as provided in the plan. UAR made no claim in the bankruptcy proceeding for any guaranteed royalties respecting the first option period of the agreement, and the Bankruptcy Court allowed no guaranteed royalties respecting the option period. Furthermore, neither the confirmation order nor Record Club's plan of arrangement contains any provision preserving any claims against Record Club. Accordingly, Record Club concludes that the claim was discharged.

UAR's right of setoff, however, is unaffected by Record Club's discharge in bankruptcy. § 68(a) of the Bankruptcy Act permits setoffs of mutual debts between the bankrupt and a creditor. 11 U.S.C. § 108(a). Although § 14(f)(2) enjoins creditors from "instituting or continuing any action or employing any process to collect debts" from the bankrupt, 11 U.S.C. 32(f)(2), the courts have held that § 14(f)(2) bars only affirmative action to recover the debt, and does not bar the assertion of a setoff as a defense to an action brought by the debtor. *See In re Slaw Constr. Corp.,* 17 B.R. 744, 747 (Bankr.E.D.Pa.1982); *Binnick v. Avco Financial Servs. of Bev., Inc.,* 435 F.Supp. 359, 363 (D.Neb.1977). Moreover, denial of UAR's setoff would be inconsistent with the principle that damages for breach of contract should not put plaintiff in a better position than if there had been no breach. If UAR had not breached, Record Club would have been required to pay the $120,000 as a guaranteed minimum royalty. Record Club's damages, therefore, should be reduced by the amount of the guaranteed minimum royalty. Hence, plaintiff's motion to dismiss the $120,000 setoff is denied.

■ Record Club asserts that Capitol's $805,123.42 claim cannot be setoff against Record Club's damages because it is precluded as a post-filing transfer under § 68(b) of the Bankruptcy Act, 11 U.S.C. § 108(b) (repealed 1978). Section § 68(b) of the Bankruptcy Act provides:

A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate and allowable under subdivision g of section 57 of this Act; or (2) was purchased by or transferred to him after the filing of the petition or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent or had committed an act of bankruptcy.

Record Club reasons that the 1981 merger constituted a post-petition transfer of Capitol's claim to UAR. Therefore, Record Club concludes that the proposed setoff is prohibited.

■ Record Club's interpretation of § 68(b)(2), however, is incorrect. To invalidate a setoff acquired after the filing of the bankruptcy petition plaintiff must show that it was acquired with the intention of using it as a setoff. *See Bel Marin Driwall, Inc. v. Grover,* 470 F.2d 932, 934–35 (9th Cir.1972) (considering creditor's intention in determining whether to allow setoff of a claim transferred after filing of the bankruptcy petition); *Tucson House Constr. Co. v. Fulford,* 378 F.2d 734, 735–37 (9th Cir.1967) (same). Record Club has not shown that UAR and Capitol merged with a view to using Capitol's claim as a setoff against Record Club. This is an issue of fact for trial.

■ Record Club also challenges the setoff of Capitol's claim on the ground of lack of mutuality of obligation. § 68(a) of the Bankruptcy Act provides for setoffs

2. The Bankruptcy Act was repealed in 1978 and replaced by the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549 ("the Code"). § 403(a) of the Code provides that any matters relating to a case that was commenced under the Act are to be determined under the Act. Pub.L. 95–598, 92 Stat. 2683, *reprinted in* 11 U.S.C. notes preceding § 101 at 7. The issues in this case are closely related to Record Club's bankruptcy; in fact, Record Club's counterclaims in the bankruptcy proceeding incorporated the complaint in this case. Since Record Club filed for bankruptcy under the Act, the bankruptcy issues now pending before the Court are governed by the Act.

"in all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor." Record Club asserts that the debt is not mutual because it did not arise against UAR, and was only transferred to UAR after the filing of the bankruptcy petition. This is a meritless argument. Were the Court to accept this interpretation it would render superfluous § 68(b)(2)'s limitation on post-filing transfers of setoffs, since any setoff which was transferred after filing would not be a mutual debt or credit.

### III. *Conclusion*

For the foregoing reasons, defendant's motion for summary judgment is denied. Plaintiff's motion for partial summary judgment is also denied.

SO ORDERED.