**Brian MINDEL, Plaintiff,**

v.

**IMAGE POINT PRODUCTIONS, INC., Defendant.**

**No. 88 Civ. 1134 (RPP).**

United States District Court, S.D. New York.

Nov. 20, 1989.

Milgrim Thomajan & Lee, P.C. by Robert A. Meister, New York City, for plaintiff.

Gilbert, Segall and Young by Bernard J. Rosenthal, New York City, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION

ROBERT P. PATTERSON, Jr., District Judge.

### I. FINDINGS OF FACT

Plaintiff Brian Mindel ("Mindel") is a film director who specializes in commercial advertisements for television. He resides in London, England. Defendant Image Point Productions, Inc. ("Image Point") is a California corporation which has an office in New York. Image Point acts as a producer of television commercials. It is wholly owned by Cannell Productions, Inc., a well known and successful producer of television programs.

In early 1987 Mindel determined to try to arrange to market his services in the United States. Among those he contacted were Houston Winn, Image Point's executive producer and sales representative in New York, and Jonathan Miller, President of Image Point. Because he felt Winn was particularly responsive to his style of directing, Mindel decided he would try to arrange to direct commercials that Image Point would produce.

On or about June 15, 1987, Image Point sent an outline of a proposed agreement to Mindel. Mindel requested changes in that proposal and on July 7, 1987 Image Point sent him a "redraft of the general terms," which included the changes Mindel had requested. Thereafter, Image Point prepared and sent to Mindel a revised letter agreement dated July 13, 1987. Prior to signing that letter agreement, Mindel gave Image Point permission to promote his services and Image Point began to offer the services of Mindel to potential clients.

In August 1987 Mindel visited the Image Point offices in California at its expense to meet Image Point personnel and clients.

During this visit, on August 12, 1987, Mindel signed the revised letter agreement dated July 13, 1987. It required Mindel's exclusive services as a director for a period of one year, and provided Mindel a minimum income guarantee of $200,000 a year, payable in 12 equal monthly installments, plus benefits and job-related expenses. It also provided for Mindel to be paid director's fees of $6,500 per shooting day, $3,250 per pre-light day, and a credit of 25% of the "budgeted mark-up," or production fee, of any commercial project on which Mindel rendered director's services (Exh. 6), which amounts would be credited to Mindel and then paid out to him when the credited amount exceeded the $200,000 guarantee.[1]

The Agreement also provided,

While it is anticipated that the Initial Term shall commence on August 1, 1987, this commencement date is predicated on Artist having obtained an H–1 visa and being permitted to enter the United States by that time. In the event that the visa has not been obtained by that date, the effective commencement for the Initial Term shall be deemed to be the first date on which both of these two conditions have been met.

After considerable delay, on October 1, 1987 Mindel was issued his H–1 visa by the U.S. Department of Justice, Immigration and Naturalization Service.

In the meantime, on September 15, 1987, Image Point prepared a Commercial Production Cost Summary ("bid sheet") for a proposed group of four commercials for GTE/Sylvania lighting products to be directed by Mindel. On September 18, 1987, Image Point prepared a second bid sheet for a proposed Hallmark commercial to be directed by Mindel (the "Hallmark Commercial"). The budgeted mark-up or production fee shown on this second bid sheet was $60,550.00, of which Mindel's credit under the Agreement was $15,132.50.

---

1. Paragraph five of the agreement reads, in pertinent part:

Until such time as the director's fees and mark-up participations otherwise due Artist exceed the amount of the guarantee payable to artist hereunder, all such sums shall be credited against said guarantee. At such time as said fees and participations exceed Artist's guarantee, the following payment schedule shall apply....

On October 26, 1987 Image Point signed the production contract for the four commercials for GTE/Sylvania lighting products to be directed by Mindel for $357,587. On October 29, 1987, Miller signed a Television Commercial Production Specifications and Contract with the advertising firm of Ogilvy and Mather as agent for Hallmark for the Hallmark Commercial. Shortly thereafter, Mindel directed the GTE and Hallmark commercials.

Houston Winn, Image Point's Executive Producer and Sales Representative based in New York, whose style had originally attracted Mindel to Image Point, was fired on January 4, 1988, in part because of an incident involving Mindel. Specifically, in November, 1987 Winn advised Miller that Mindel had agreed to waive his share of the production costs for the Hallmark commercial. Miller asked Winn to have Mindel submit a written confirmation.

Thereafter, on December 3, 1987, just before Mindel was leaving for London and then for a vacation in Australia, Winn and Miller were to meet with Mindel. Moments before the meeting, Winn and Miller met in the hallway, and Winn told Miller there was no budgeted production fee for the Hallmark Commercial, and showed him a computer printout of a bid sheet which showed "none" as the budgeted production fee for the commercial. Miller testified that he was surprised because the information was not in accordance with his recollection, but stated he felt he did not have time to go into the matter then.

At the meeting, Winn told Mindel that there had been no budgeted production fee for the Hallmark Commercial and showed Mindel, in Miller's presence, the same computer printout of a bid sheet reflecting no production fee. Miller remained silent and did not contradict Winn's statement during the meeting.

After the meeting with Mindel, Miller investigated the situation involving the Hallmark Commercial and found that the computer bid sheet Winn had displayed

was false and that a $60,550.00 production fee had been submitted to Hallmark. He then took steps to terminate Winn and replace him with William Barnett, an experienced producer. Winn's termination date was January 4, 1988.

The firing of Winn marked the beginning of the end of the agreement between Mindel and Image Point, and it appears to have been a contributing cause to the following events.

Raymond Lofaro, an independent agent representing auditors and production companies, arranged to have dinner with Miller on January 4, 1988 and proposed that as a replacement for Winn he be retained to represent the directors affiliated with Image Point. Miller declined and stated he had made arrangements to utilize Barnett. Lofaro predicted Image Point would not be able to retain Mindel's services and stated he would "go after" Mindel and other directors represented by Image Point. At or around this time, Lofaro called Mindel. Miller also called Mindel in London to tell him of Winn's termination and the new arrangements. The evidence is conflicting as to when this occurred. On January 11, 1988, Mindel returned to New York from England to prepare for the shooting of a commercial for a product called Jet Dry.[2]

Lofaro's company was a representative for a commercial production company known as Kay Tate & Partners, of which David Tate, a long-time acquaintance of Mindel, was a principal. During January, 1988, Mindel and Tate had several conversations concerning Mindel's possible affiliation with Tate's company. At the end of January and early February, Timothy Case, an employee of Image Point with some responsibility for representing Mindel, left Image Point and joined Lofaro's company. Later, in March, 1988, Mindel, Lofaro and Tate entered into formal agreements for producing commercials directed by Mindel in the United States.

On January 12, 1988, Miller had dinner with Mindel and gave a lengthy explanation

---

**2.** On the day of his return, Mindel complained that he had not received his draw check. Investigation by Image Point revealed that the money transfer had been made to an account Mindel had closed. On January 12, 1988 a new money transfer was made to Mindel's new account.

of Image Point's reason for termination of Winn, and Barnett's qualifications as his replacement, after which Mindel agreed he would try to work with Barnett. On January 14, 1988, Mindel had dinner with Lofaro.

Mindel began directing the Jet Dry commercial on January 18, 1988. Barnett acted as Image Point's executive producer. During the course of the pre-production and production of that commercial, Mindel acted rudely to and was uncooperative with the representatives of Bozell, Jacobs, the advertising agency for whom the commercial was being produced.

On January 21, 1988 Mindel informed Miller that Barnett was not suitable as his representative and that he no longer wanted to work for Image Point and was leaving the company. Miller attempted to dissuade Mindel, and told him that Cannell Productions had made a large investment based on his contract and that other people's livelihoods would be affected. It became clear to Miller, however, that he was not going to be able to change Mindel's mind. Miller told Mindel he would get back to him with a proposal as to how a termination might be arranged.

On January 25, 1988 Miller telephoned Mindel with a proposal that the parties continue their relationship for a period of 60 days, at the end of which the parties would announce the termination of the relationship, and Mindel would be free to work for others. Under the proposal, Mindel would still be obligated to direct any commercials Image Point contracted to make during the 30 days following the 60 day period.

On January 26, 1988 Mindel told Miller that both parties had better get lawyers involved and Mindel retained George Graff as his attorney Graff wrote a letter to Miller on January 27, 1988 containing a counterproposal to Miller's proposal. The counterproposal suggested that Raymond Lofaro be retained by Image Point to act as Mindel's sales representative and that Mindel have artistic control over all commercials he filmed. Image Point's lawyer, Richard E. Posell, rejected Graff's counter-proposal by telecopier letter on January 27, 1988.

Mindel returned to England on January 29, 1988. Also on that day, Graff, relying on rumors of financial problems at Image Point that Mindel had heard during January, responded to Posell's letter by telecopier letter to Posell, stating that "unless Image Point is able to immediately provide ... adequate assurance of its ability to honor his [sic] financial obligations, we ... will advise Mr. Mindel that he is free to accept employment elsewhere." Later that day, Posell replied by telecopier that Image Point was financially strong and that there was no basis for the request.

On February 2, 1988 Posell and Graff had a telephone conversation relating to the parties' respective positions, which Posell followed up with a letter to Graff by mail on February 3, 1988. Graff did not receive this letter until Monday, February 8, 1988. Meanwhile, on February 5, 1988, Graff sent a letter by telecopier to Posell. This letter stated:

> Mindel is prepared to give your client the opportunity to show him that his concerns are not justified. In particular Mr. Mindel has authorized me to convey his assurance that so long as your client honors its obligation thereunder, he will continue to respect the contract and will not accept employment from any other source. However, he has also advised me that he has not yet received the installment on his guaranteed advance that was due on February 4, and we hope and expect that you will remedy that default forthwith. (Mindel Exh. 11)

Posell did not see this letter until Monday, February 8, 1988. He then forwarded a copy to Miller by telecopier. On the same day, Graff called Posell on the telephone and told him that Mindel had not received the February payment. Posell said he would speak to his client. On February 9, 1988, Graff again spoke to Posell on the telephone and was told that Miller wanted to be sure Mindel was back on board and that, if he was, the money would be wire-transferred into Mindel's account shortly. He also mentioned that a story-

board for a proposed commercial was being sent to Mindel. Also, on February 10, Miller telephoned Mindel in London, was assured by Mindel that he would honor the contract, and told Mindel the February payment would be in Mindel's account shortly. Miller gave instructions for such payment that same day.

On February 11, 1988 at 9:15 a.m. Pacific Standard Time, Wells Fargo Bank was instructed by Mr. Hubsch of Cannell Productions, acting on behalf of Image Point, to make the wire transfer to Mindel's account at Barclays Bank in New York. On February 11, 1988 the transfer of funds, in the amount of $16,666, was credited to Mindel's account in Barclays Bank in New York at 3:26 p.m. Eastern Standard Time (12:26 Pacific Standard Time).

At 11:31 Eastern Standard Time on the same day, Graff sent a letter by telecopier, stating:

[T]he monthly installment of Mr. Mindel's guaranteed advance, due on February 4, 1988, has not yet been received. This clear breach of its fundamental obligation to Mr. Mindel, particularly in the face of the concerns I expressed in my prior correspondence with you, only serves to confirm your client's unwillingness or inability to honor its financial commitments to Mr. Mindel.

Under the circumstances, Mr. Mindel obviously can not continue to sacrifice his opportunities to obtain employment elsewhere and he will proceed forthwith to do so in order to mitigate the damages resulting from your client's breach. Under all circumstances, however, Mr. Mindel is entitled to recover his earnings in excess of the advances he has received to date and I suggest that you contact me immediately to explore arrangements for the settlement of his account. (Defendant's Exh. 58)

Posell responded by telecopier to Graff at 5:15 p.m. Eastern Standard Time that day informing him that the payment was in process. On February 12, 1988, Graff responded by telecopier to Posell's letter.

Meanwhile, on February 10, 1988 the storyboard materials were received by Mindel in England. At 4:00 p.m. on February 11, 1988, Barnett called Mindel about the storyboard materials. Mindel stated he did not wish to discuss the materials until "the matter in California" was resolved. The next day, Barnett called Mindel to discuss the new storyboard and was told Graff had advised that Mindel's agreement with Image Point was terminated. Mindel also telephoned Tate and advised Tate that he had not yet received payment from Image Point.

Mindel received from Image Point five of the guaranteed payments required under the Agreement, each in the amount of $16,-666.66 on September 17, 1987, October 28, 1987, November 25, 1987, January 12, 1988 and February 11, 1988, respectively, for a total of $83,333.30. Image Point also paid Mindel's initiation fee and dues to the Directors Guild of America. For his part, Mindel directed six commercials for Image Point—four GTE/Sylvania commercials, one Hallmark commercial, and one Jet Dry commercial.

Subsequent to February 11, 1988 and prior to October 1, 1988, Mindel directed commercials in Europe and the United States and Canada, which netted him fees of $27,458.00, $52,593.00, $30,103.00, $10,-628.30, $18,716.00.

## II. CONCLUSIONS OF LAW

Both parties are claiming that the other breached the agreement dated July 13, 1987. After considering the demeanor of the witnesses and the testimony and other evidence presented, the Court rules as follows.

■ Defendant did not breach the agreement. Until February, 1988, Mindel received his monthly payments from Image Point promptly, indeed one in late September before it was due, except for one occasion in January when a payment was directed to an account plaintiff had closed. Defendant also provided Mindel with his director's dues to the Directors Guild of America, other benefits provided for under the agreement and the requisite representation as a producer of commercials.

Plaintiff's claim that the Agreement actually commenced on August 1, 1987 and that, accordingly, he is due guaranteed monthly payments for August and September is not credible and appears to be an afterthought. In accordance with its terms, performance under the agreement commenced on October 1, 1987, the date of the issuance of Mindel's work visa, making it legal for him to work for hire in the United States. Moreover, nowhere in his correspondence with Posell did Graff assert that such payments were due and owing. In fact, Graff only claimed the February payment was due on the day after it would have been had the contract been in force.[3]

Defendant's failure to make the February 4 payment called for under the agreement was excused by Mindel's repudiation of the agreement on January 21, when he insisted Barnett was unsuitable as his representative, stated he did not want to work any longer for Image Point and was leaving the company. *See Salen AB v. Pierot & Sons, Inc.*, 559 F.Supp. 503 (S.D.N.Y. 1983), *aff'd* 738 F.2d 419 (2d Cir.1984). Whether Mindel's unhappiness stemmed from Winn's departure, Tim Case's departure and signing on with Lofaro, or Lofaro's and Tate's blandishments is irrelevant to this lawsuit. In any event, when Mindel repudiated the contract, Image Point's duty to perform under the contract, including its duty to make the February 4, 1988 payment, was discharged. *Record Club of America, Inc. v. United Artists Records,*

*Inc.*, 80 B.R. 271 (S.D.N.Y.1987); *Restatement (Second) of Contracts* § 253(2).[4]

This effect of Mindel's repudiation was not altered by Image Point's attempts to convince Mindel to change his mind, nor was it altered by Image Point's proposal for amicable termination. *Restatement (Second) of Contracts,* § 257.[5] Image Point was also not required to accept Graff's counterproposal, that Raymond Lofaro be hired as Mindel's sales representative and that, in effect, Mindel act as his own producer.

■ On February 5, 1988, one day after Mindel would have been due a payment under the Agreement had he not repudiated it, Image Point was advised by Graff that Mindel would perform under the agreement and Graff demanded that the payment be made "forthwith." Mindel having repudiated the contract, his revocation of that repudiation one day after his check otherwise would have been due did not suddenly put Image Point in default. *See Record Club,* 80 B.R. at 283 (defendant "did not breach the agreement by failing to make the post-repudiation payment"). Under these circumstances, Image Point had a reasonable time within which to perform its obligations under the contract. *See* 4 Corbin, *Contracts* § 980 at 933 (1951) ("If the time left [for performance by the nonrepudiating party] after the retraction had been unreasonably short, no doubt a reasonable time thereafter would have been allowed.").[6]

3. Mindel's claim that Posell made false statements to Graff regarding its ability to honor its financial obligations also has a hollow ring. Mindel had known from the beginning that Image Point was a start-up venture of Cannell Productions. Graff, as an attorney, knew or should have known that start-up companies have poor balance sheets in their early years. Graff never asked that Cannell Productions guarantee Mindel's payments, as he might have if he was not satisfied by Posell's assurances that Image Point was financially stable.

4. *Restatement (Second) of Contracts* § 253(2) states in full: "Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance."

5. *Restatement (Second) of Contracts,* § 257 states: "The injured party does not change the effect of a repudiation by urging the repudiator to perform in spite of his repudiation or to retract his repudiation."

6. Because there is no evidence that Image Point materially changed its position or indicated to Mindel that it considered the repudiation to be final, Mindel was free to retract his repudiation. *Restatement (Second) of Contracts* § 256 states:

The effect of a [repudiation] is nullified by a retraction of the statement if notification of the retraction comes to the attention of the injured party before he materially changes his position in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final.

Image Point, upon receiving knowledge of Graff's letter, quite rightly requested to confirm with Mindel that he would honor the contract terms. *See, e.g., Record Club of America v. United Artists Records*, 643 F.Supp. 925 (S.D.N.Y.1986) (under New York Uniform Commercial Code § 2–611, unless reasonable person in nonrepudiating party's position would conclude that repudiating party has clearly and unambiguously indicated that it will perform, there is no retraction, and non-repudiating party is entitled to justifiable assurances). Given Mindel's prior behavior, Image Point was entitled to make reasonable inquiries to ensure that Mindel's retraction of the repudiation was sincere, which Miller did by attempting to telephone Mindel and eventually reaching him in London on February 10, 1988. Mindel assured Miller of his sincerity and, in reliance, Miller stated that the payment would be in Mindel's bank account shortly. Thus, in reliance on Mindel's confirmation that he would honor the contract terms, Image Point agreed to reinstate the contract. Nevertheless, Mindel refused further performance under the contract and refused to return the payment.

Mindel's insistence that Image Point's payment on February 11 was too late, and his refusal to return that payment after he refused to perform further, were unreasonable. He did not assure Miller of his intention to perform until February 10, and Image Point responded quickly with the payment the next day. The difference of one day is not enough to justify his refusal to perform as he had agreed. Moreover, Image Point, whose duty to perform had been discharged by Mindel's repudiation, relied on his assurances of performance in its decision to make the payment. Thus, once Image Point made the payment, Mindel was required either to perform or to tender the payment back to Image Point.

Accordingly, plaintiff owes damages to defendant of $16,666.66 for the payment he received on February 11, 1988, with interest from that date to the date judgment is entered herein.

Plaintiff claims that he is entitled to his incentive pay under the contract, *i.e.*, that amount of the production fees and director's fees for the six commercials he directed which exceeded the $83,333.33 he received in monthly guarantee payments. However, these amounts were not to be paid out to Mindel "until the sum of the director's fees and mark-ups exceeded the amount of the guarantee." Amended Pre-Trial Order ¶ 12. Thus, plaintiff did not "earn" any incentive pay until his credits exceeded $200,000. That amount was never reached because plaintiff repudiated the contract in January and refused to perform in February. He is therefore not entitled to any amounts over and above the monthly payments that he received prior to repudiating the contract.

Defendant also claims damages for rent and related salaries expended in expectation of Mindel performing his one-year agreement as a director. The defendant acted as producer for other directors in New York in 1987 and 1988. Accordingly, the defendant has not shown by a preponderance of the credible evidence that such expenses were incurred solely in reliance on Mindel's performing his agreement as agreed.[7]

The above constitutes the findings of fact and conclusions of law of the Court.

Defendant is ordered to prepare and submit a proposed judgment on notice within 10 days of the date of entry of this decision.

SO ORDERED.

---

7. In view of the above findings, it does not appear necessary to make any finding as to whether Mindel was an employee of the defendant. However, the Court finds he was not. No taxes were withheld from his guaranteed income, and the payments of additional benefits were negotiated between the parties. The agreement is akin to a joint venture in which the producer acts as sales representative, negotiator and contractor of agreements on behalf of both parties.